2012 Ark. App. 21

**Tim GREEN, Appellant**

v.

**CITY OF NORTH LITTLE ROCK, Appellee.**

**No. CA 11–586.**

Court of Appeals of Arkansas.

Jan. 4, 2012.

Luther Oneal Sutter II, Benton, for appellant.

John Lennon Wilkerson, North Little Rock, for appellee.

DOUG MARTIN, Judge.

Appellant Tim Green, a former North Little Rock police officer, appeals from the decision of the Pulaski County Circuit Court granting the motion for summary judgment filed by the appellees, collectively referred to herein as "the City of North Little Rock" or "the City." [1]

Green began working as a police officer for North Little Rock in 1997. During his tenure as a police officer, he was married to Carmen Green, who was also a North Little Rock police officer. On January 2, 2007, Carmen Green approached North Little Rock Police Lieutenant Brian Scott and conveyed an allegation that Tim Green was using steroids. Scott relayed the allegations to Captain Donnie Bridges that same day, informing Bridges in a memorandum that Carmen Green had advised

---

1. The named defendants/appellees are the City of North Little Rock, North Little Rock Police Captain Donnie Bridges, North Little Rock Police Lieutenant Brian Scott, North Little Rock Police Chief Danny Bradley, North Little Rock Police Captain Mike Davis, and North Little Rock Police Lieutenant Jim Scott. All of the named individuals were sued both individually and in their official capacities.

Scott that she had discovered a large bag of syringes in her home; in addition, Ms. Green said that she had researched her bank statements and discovered payments for suspected steroids to a company from overseas.

Upon receiving this information, Bridges notified North Little Rock Police Chief Danny Bradley of the allegations. Bridges and Bradley contacted Captain Mike Davis, Tim Green's supervisor, and discussed Carmen Green's allegations. At that meeting, Davis informed Bradley of two recent hostile encounters between Green and two other North Little Rock Police Department officers. Bradley also recalled seeing Green recently and noticing that he had "become swollen and bloated," according to Bridges's affidavit. Bradley concluded that, while Carmen Green's allegations alone might not warrant the ordering of a drug test, her allegations, combined with the two hostile encounters and Bradley's personal observations, amounted to reasonable suspicion that Green was using steroids.

At that point, Bradley ordered Green to submit to a drug test pursuant to the Police Department's "Alcohol and Drug Policy," which provides that members of the police force "shall be required to submit to chemical testing . . . [w]hen the City has reasonable suspicion that a member has violated [the Police Department's] prohibitions regarding use of alcohol or drugs." Bridges informed Green that he was required to take the "reasonable suspicion" drug test, and on January 9, 2007, Lieutenant Jim Scott and Sergeant Janice Jensen (both of whom were officers with the department's Professional Standards division) transported Green to the testing facility, where Scott read Green the "reasonable suspicion" paperwork. Green signed the form, was photographed, and provided a urine sample. In addition,

Green was placed on administrative leave by Bradley.

The sample was analyzed by Dr. Richard Doncer, who contacted Scott and informed him that Green had tested positive for high levels of the anabolic steroid Nandrolone. Dr. Doncer's official test results, however, contained the following conclusion:

After review of the data on Officer Tim Green's drug test, I have made the final interpretation as a negative test. He did have a legal use administered by a physician in the past. Due to the uncertainty and poor data available regarding the metabolism and detectability of the drug (Nandrolone), I feel that this is the correct decision.

Perhaps, you may want to advise the donor to refrain from future use, even if prescribed legally. You may also want to randomly drug test him in the coming months to assure his levels are declining.

On February 1, 2007, Bradley wrote a letter to Green advising that Green was being released from administrative leave and returned to his regularly scheduled duties in the patrol division. On February 5, 2007, Green completed a "work environment survey" in which he claimed to be aware of "behaviors in the workplace" that violated the Police Department's discrimination and harassment policy. Green was interviewed by Lieutenant Scott and Sergeant Jensen about his claims on February 14, 2007. During that interview, Green complained about "what was done to [him] on January the 9th being placed on administrative leave due to false allegations by members of this department." Green also asserted that he was treated in a "threatening and intimidated [sic] manner" when he was called and when he tried to explain that he had a prescription for the steroids. Green further advised Scott and Jensen

that he did not know the nature of the reasonable suspicion underlying his drug test, and he complained that no one would tell him.

On March 19, 2007, Bradley sent Green a letter in which Bradley related that "the complaint that you voice in your statement does not fall under the purview of [the Department's discrimination and harassment policy] or any other department policies, rules, regulations, standards of conduct dealing with illegal discrimination or harassment; therefore, no further investigation of your complaint will be conducted." Bradley did, however, schedule a meeting with Green to discuss the complaint.

Bradley and Davis met with Green on May 16, 2007, after which Bradley wrote an internal memorandum to memorialize the discussion that was had. Bradley wrote that Green felt he was subjected to the drug testing and was being treated differently because of his pending divorce from Carmen Green. Bradley advised Green, "that certainly was not a motivation on my part, nor did I have any knowledge of it being a motivation of any other supervisor in this department."

Green apparently made no further complaints about the situation, and he received commendations from the Police Department on July 30, 2007 and September 11, 2007, as well as a letter of recognition on November 9, 2007. Green received a pay raise in July 2007.

Green sustained an on-the-job injury to his knee on December 10, 2007, while responding to a police service call. He sought workers' compensation benefits, and on December 11, 2007, his physician, Dr. Vander Schilden, recommended that Green be taken off work until further notice. Green received workers' compensation benefits until February 27, 2008. In addition, he was given "injured-on-duty days," meaning he was entitled to full pay while recovering from his injury, from December 11, 2007, the day after his injury, until January 27, 2008.

Green submitted the initial paperwork for taking leave pursuant to the Family and Medical Leave Act (FMLA) to Bradley on December 10, 2007. Green never completed the paperwork, however. On December 12, 2007, Green filed an application for duty-disability retirement with the Arkansas Local Police and Fire Retirement System (LOPFI). On December 26, 2007, a representative from LOPFI contacted Bradley to inform him that Green had applied for duty-disability retirement and to seek a written statement certifying whether the disability was duty-related. Bradley advised LOPFI on January 3, 2008, that Green injured his knee while responding to a service call and that the Department did not oppose Green's application for disability retirement.

On January 31, 2008, Dr. Vander Schilden released Green to return to a "desk-type occupation until a determination is made by the medical board as to the status of his medical retirement." In a separate note dated that same day, Dr. Vander Schilden advised that Green was capable of returning to a desk-type job on January 28, 2007, but the doctor did not want Green returning to work in any capacity while he was taking pain medication. Dr. Vander Schilden again stated on February 4, 2008, that Green could return to work in a "desk-type capacity."

Based on Dr. Vander Schilden's representations, Bradley assumed that Green would seek light-duty work when he returned to duty, and Bradley thus began filling out the appropriate paperwork that would allow Green to do so. The "Light/Modified Duty Agreement" provided that Green could perform light-duty

work in the service division of the Police Department from February 4, 2008, until February 18, 2008.

On February 8, 2008, however, Green sent an interdepartmental communication to Bradley informing the chief that Green intended to resign, effective as of February 22, 2008. Green's supervisor, Captain Davis, received this letter on February 14, 2008. On that same date, Bradley approved Green for light-duty work. When Bradley received Green's resignation letter, however, he rescinded his decision to allow Green to work a light-duty position.[2] Bradley explained in an affidavit as follows:

> Upon reflection of ... Green's medical retirement, which I believed meant that he was claiming a disability and could not return to work; his resignation, which also meant he would not be returning to work; and the "light-duty" policy, which limits "light duty" positions to those who are going to return to work, I decided to rescind my decision concerning ... Green's "light duty" position.

In a deposition, Bradley stated, "I mean, he's leaving the department, so there's no point in continuing his light duty." Bradley denied, however, that he would ever have denied Green light duty in order to force a retirement.

Upon receiving Bradley's rescission of the light-duty agreement, Green submitted a revised resignation letter in which he expressed his belief that he was "being discriminated against and treated unfairly." Accordingly, Green announced his intention to make his resignation effective February 19, 2008.

Green filed a complaint[3] against the City on December 15, 2008, alleging that, on January 9, 2007, the City caused Green to be arrested without probable cause, drug tested, and placed on administrative leave. Green also alleged that, by virtue of the drug test, he was deprived of his right to be free from unreasonable search and seizure pursuant to the Fourth Amendment of the United States Constitution and also pursuant to the Arkansas Constitution. Moreover, Green alleged that the deprivation of his state and federal constitutional rights constituted a violation of the Arkansas Civil Rights Act. In the second count of his complaint, Green alleged that the City denied him the benefit of his rights pursuant to the FMLA and that the City's actions constituted "interference with [Green's] FMLA rights as well as retaliation."[4]

The City answered and filed a motion for summary judgment. In its motion, the City asserted that Green failed to establish that a violation of his Fourth Amendment rights or his FMLA rights occurred, and that, even assuming any violations had occurred, the City was entitled to qualified immunity and, accordingly, summary judgment. Regarding Green's Fourth Amendment claims, the City as-

---

2. The police department's policy directive concerning temporary light- or modified-duty work provides that "temporary light duty" work is "work assigned *during recovery from temporary work restrictions* that prevent members from performing one or more of the essential functions of their jobs." That directive also provides that "[t]emporary light or modified duty assignments *will not extend beyond the actual time required for recuperation.*"

3. The complaint was originally filed in Saline County but was subsequently transferred to Pulaski County.

4. Because the retaliation issue is mentioned nowhere in Green's brief, we conclude that he has abandoned this issue on appeal.

serted that ordered submission to a drug test was incidental to Green's employment as a police officer and thus did not violate the Fourth Amendment; moreover, the City contended that Bradley had reasonable suspicion to order the drug test. As for Green's FMLA claims, the City argued that there is no entitlement to "light-duty" work under the FMLA, and accordingly, Green had failed to state a cause of action for a violation of that Act.

Green responded to the City's motion for summary judgment by claiming that the City had "raised strawman arguments on [Green's] constitutional claims." He reiterated his claims from his complaint that he was arrested and subjected to an unconstitutional search and additionally argued that he was denied his rights pursuant to *Garrity v. New Jersey*, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967). In addition, Green argued that with respect to his FMLA claim, he was "denied light duty, when others were given this benefit" and was "forced to retire before his FMLA leave was exhausted." Green further asserted that the City was not entitled to any kind of qualified immunity.

After a hearing, the circuit court entered an order on March 4, 2011, granting the City's motion for summary judgment, finding that there existed no genuine issue of material fact, that the City was entitled to judgment as a matter of law, and that Green had failed to meet proof with proof. Green filed a timely notice of appeal on March 14, 2011.

The law is well settled regarding the standard of review used by this court in reviewing a grant of summary judgment. *Crockett v. C.A. G. Invs., Inc.*, 2011 Ark. 208, 381 S.W.3d 793. A trial court will grant summary judgment only when it is apparent that no genuine issues of material fact exist requiring litigation and that the moving party is entitled to judgment as a matter of law. *Id.* On appeal, this court determines if summary judgment was appropriate based on whether the evidentiary items presented by the moving party leave a material question of fact unanswered. *Bryan v. City of Cotter*, 2009 Ark. 172, 303 S.W.3d 64. Summary judgment is also appropriate when the trial court finds that the allegations, taken as true, fail to state a cause of action. *Cottrell v. Cottrell*, 332 Ark. 352, 965 S.W.2d 129 (1998); *Hice v. City of Fort Smith*, 75 Ark.App. 410, 58 S.W.3d 870 (2001). We view the evidence in a light most favorable to the party against whom the motion was filed, resolving all doubts and inferences against the moving party. *Harrisburg Sch. Dist. No. 6 v. Neal*, 2011 Ark. 233, 381 S.W.3d 811.

In Green's first point on appeal, he argues that he was unconstitutionally arrested and searched when he was required to take a drug test on January 9, 2007. He begins from the premise that there was no probable cause for "arresting" and obtaining a urine sample from him, and thus, according to Green, the "nonconsensual, warrantless, and suspicionless search" was unauthorized and unconstitutional and violated his Fourth Amendment rights. We disagree.

It is true that a urine test conducted by a state actor is a search within the meaning of the Fourth Amendment. *Ferguson v. City of Charleston*, 532 U.S. 67, 76, 121 S.Ct. 1281, 149 L.Ed.2d 205 (2001); *Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 617, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989). The Fourth Amendment, however, does not proscribe all searches and seizures, but only those that are unreasonable. *Skinner*, 489 U.S. at 619, 109 S.Ct. 1402. What is reasonable "depends on all of the circumstances surrounding the search ... and the nature of the search ... itself." *Id.* (quoting *United*

*States v. Montoya de Hernandez,* 473 U.S. 531, 537, 105 S.Ct. 3304, 87 L.Ed.2d 381 (1985)). Except in certain well-defined circumstances, a search is not reasonable unless it is accomplished pursuant to a judicial warrant issued upon probable cause. *Id.* The United States Supreme Court has recognized exceptions to this rule, however, when "special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable." *Id.* (quoting *Griffin v. Wisconsin,* 483 U.S. 868, 873, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987)). In such circumstances, it is necessary to balance the individual's privacy expectations against the Government's interests to determine whether it is impractical to require a warrant or some level of individualized suspicion in the particular context. *Nat'l Treasury Employees Union v. Von Raab,* 489 U.S. 656, 665–66, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989). The *Skinner* Court explained further as follows:

> Our cases indicate that even a search that may be performed without a warrant must be based, as a general matter, on probable cause to believe that the person to be searched has violated the law. When the balance of interests precludes insistence on a showing of probable cause, we have usually required "some quantum of individualized suspicion" before concluding that a search is reasonable. We made it clear, however, that a showing of individualized suspicion is not a constitutional floor, below which a search must be presumed unreasonable. In limited circumstances, where the privacy interests implicated by the search are minimal, and where an important governmental interest furthered by the intrusion would be placed in jeopardy by a requirement of individualized suspicion, a search may be reasonable despite the absence of such suspicion.

*Skinner,* 489 U.S. at 624, 109 S.Ct. 1402 (internal citations omitted).

Thus, rather than simply assuming, as does Green, that the order for him to submit to a drug test was an unconstitutional arrest, we must determine whether the drug test was reasonable. In so doing, we must balance the State's interests against Green's privacy expectations. The United States Supreme Court has found that the government has a compelling interest in ensuring the safety and fitness for duty of government employees engaged in activities that implicate public safety. *See, e.g., Skinner, supra* (approving policies mandating drug testing of railroad employees involved in certain kinds of railroad accidents); *Von Raab, supra* (upholding drug testing for employees of the United States Customs Service who had direct involvement in drug interdiction or enforcement or related laws and who carried firearms as part of their job duties).

■ Here, the "purpose statement" of the North Little Rock Police Department's Alcohol and Drug Policy makes clear that the Police Department "has a vital interest in providing for the safety and well being of all members and the public as well as maintaining efficiency and productivity in all of its operations." The policy further includes police officers in its category of "safety and security-sensitive positions," which are described as those

> in which a momentary lapse of attention may result in grave and immediate danger to the public or one where the position requires enforcement of the laws pertaining to the use of illegal substances. Officers who themselves use such substances may be unsympathetic to the enforcement of the law and are, therefore, potentially subject to blackmail and bribery.

Thus, we conclude that the City's interest in maintaining an efficient police department and providing for the public safety falls squarely in the category of " 'special needs' beyond normal law enforcement that may justify departures from the usual warrant and probable cause requirements." *Skinner,* 489 U.S. at 620, 109 S.Ct. 1402.

Against the City's interests, we must weigh Green's privacy expectations. In *Skinner,* the Supreme Court considered whether taking urine samples unduly impinged upon an individual's right to privacy. The court acknowledged that such tests "require employees to perform an excretory function traditionally shielded by great privacy," *id.* at 626, 109 S.Ct. 1402, but noted that the pertinent regulations "endeavor to reduce the intrusiveness of the collection process." *Id.* Moreover, the Court examined the process of obtaining the samples against the backdrop of the relevant public-safety issues and concluded that "the expectations of privacy of covered employees are diminished by reason of their participation in an industry that is regulated pervasively to ensure safety, a goal dependent, in substantial part, on the health and fitness of covered employees." *Id.* at 627, 109 S.Ct. 1402.

In *Von Raab,* a drug test was a mandatory part of applying for employment or promotion within the Customs Service. The Court determined that the purpose of the testing program was not to serve the ordinary needs of law enforcement but to deter drug use among those seeking employment at "sensitive positions within the Service and to prevent the promotion of drug users to those positions." *Von Raab,* 489 U.S. at 666, 109 S.Ct. 1384. The *Von Raab* Court also noted that

> a warrant would provide little or nothing in the way of additional protection of personal privacy. A warrant serves primarily to advise the citizen that an intrusion is authorized by law and limited in its permissible scope and to interpose a neutral magistrate between the citizen and the law enforcement officer engaged in the often competitive enterprise of ferreting out crime. But in the present context, the circumstances justifying toxicological testing and the permissible limits of such intrusions are defined narrowly and specifically, and doubtless are well known to covered employees.

*Id.* at 667, 109 S.Ct. 1384 (internal citations and punctuation omitted).

The Court then examined the individual's right to and reasonable expectation of privacy, weighing those rights against the interference with personal liberty that results from requiring an employee to undergo a urine test:

> The interference with individual privacy that results from the collection of a urine sample for subsequent chemical analysis could be substantial in some circumstances. We have recognized, however, that the "operational realities of the workplace" may render entirely reasonable certain work-related intrusions by supervisors and co-workers that might be viewed as unreasonable in other contexts. While these operational realities will rarely affect an employee's expectations of privacy with respect to searches of his person, or of personal effects that the employee may bring to the workplace, *it is plain that certain forms of public employment may diminish privacy expectations even with respect to such personal searches.* Employees of the United States Mint, for example, should expect to be subject to certain routine personal searches when they leave the workplace every day. Similarly, those who join our military or intelligence services may not only be required to give what in other contexts

might be viewed as extraordinary assurances of trustworthiness and probity, but also may expect intrusive inquiries into their physical fitness for those special positions.

We think Customs employees who are directly involved in the interdiction of illegal drugs or who are required to carry firearms in the line of duty likewise have a diminished expectation of privacy in respect to the intrusions occasioned by a urine test. Unlike most private citizens or government employees in general, employees involved in drug interdiction reasonably should expect effective inquiry into their fitness and probity. Much the same is true of employees who are required to carry firearms. *Because successful performance of their duties depends uniquely on their judgment and dexterity, these employees cannot reasonably expect to keep from the Service personal information that bears directly on their fitness.* While reasonable tests designed to elicit this information doubtless infringe some privacy expectations, we do not believe these expectations outweigh the Government's compelling interests in safety and in the integrity of our borders.

*Id.* at 671–72, 109 S.Ct. 1384 (emphasis added) (internal citations omitted).

 Similarly, in the instant case, officers with the North Little Rock Police Department carry firearms and are frequently involved in apprehending individuals who are dealing in illegal drugs. Thus, it is not unreasonable for the City to require officers to submit to drug testing in certain circumstances in order to determine fitness of those officers to complete their duties. As such, we conclude that the drug test meets the "reasonableness requirement of the Fourth Amendment." *Id.* at 665, 109 S.Ct. 1384. As the *Von Raab* Court noted, "neither a warrant nor probable cause, nor, indeed, any measure of individualized suspicion, is an indispensable component of reasonableness in every circumstance." *Id.*

 We also note that, in the present case, not only did the test meet the general reasonableness standard, but the City actually had some "measure of individualized suspicion." *Id.* As mentioned above, Bradley determined that he had reasonable suspicion to order a drug test of Green based not solely on Green's ex-wife's allegation about the bag of syringes and the bank statements showing purchases of steroids, but also on his own personal observation of Green's physical appearance and recent aggressiveness, traits which Bradley associated with the use of anabolic steroids. The Police Department's drug policy provides that an officer may be required to submit to chemical testing "[w]hen the City has reasonable suspicion that a member has violated any of the [policy's] prohibitions regarding use of alcohol or drugs." Under the policy, "reasonable suspicion" must be "based on specific, contemporaneous, articulable observations concerning the appearance, behavior, speech or body odors of the member." Clearly, Bradley's observations, coupled with Carmen Green's allegations, provided the Police Department with reasonable suspicion to order Green to submit to a drug test.

Despite Green's contention that he was "arrested," he points to no evidence other than his own personal belief that the drug test was not job-related and reasonable under the circumstances. Moreover, although he complains that he was "seized" when he was not allowed to drive his own vehicle to the testing facility, the Supreme Court has held that "the employer's antecedent interference with the employee's freedom of movement" need not be considered an independent Fourth Amend-

ment seizure, *Skinner,* 489 U.S. at 618, 109 S.Ct. 1402, and "[t]o the extent transportation and like restrictions are necessary to procure the requisite . . . urine samples for testing, this interference alone is minimal given the employment context in which it takes place." *Id.* at 624, 109 S.Ct. 1402.

Finally, Green argues that the drug-testing order violated his rights pursuant to *Garrity v. New Jersey,* 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967). *Garrity* holds that "the protection of the individual under the Fourteenth Amendment against coerced statements prohibits use in subsequent criminal proceedings of statements obtained [from a police officer] under threat of removal from office." *Garrity,* 385 U.S. at 500, 87 S.Ct. 616. The Fifth and Fourteenth Amendment right protected in *Garrity,* however, is the privilege to be free from being compelled to communicate or otherwise provide testimony. Giving a blood or urine sample for drug testing does not violate that privilege. *Schmerber v. California,* 384 U.S. 757, 764, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966); *see also Oman v. State,* 737 N.E.2d 1131, 1144 (Ind.2000) (holding "toxicological samples are not evidence of a testimonial nature"). *Garrity* simply has no application in this situation, and Green's arguments to the contrary are unavailing. In short, we conclude that the trial court correctly granted the City's motion for summary judgment on this issue.

In his second argument on appeal, Green maintains that he "established a clear violation of the FMLA," and as such, the City and the individually named defendants are not entitled to qualified immunity. Green appears to raise two basic claims related to the FMLA: that he suffered an adverse job action by being constructively discharged, and that the City interfered with his rights under the FMLA by treating him differently than

other employees who exercised their FMLA rights.

As for the "adverse job action," Green argues that he was told to "resign or be terminated" and was thus constructively discharged. A constructive discharge exists when an employer intentionally renders an employee's working conditions intolerable and thus forces him to resign. *Sterling Drug, Inc. v. Oxford,* 294 Ark. 239, 743 S.W.2d 380 (1988) (citing *Harris v. Wal–Mart,* 658 F.Supp. 62 (E.D.Ark.1987)). It exists only when a reasonable person would have resigned under the same or similar circumstances. *Id.* Green notes that, in order to establish a constructive discharge, he "must show that conditions were so intolerable that they rendered a seemingly voluntary resignation a termination." He then cites cases from several other jurisdictions in which constructive discharges were found to exist. Other than his assertion (without citation to the record or addendum) that he was told to resign or be terminated, however, Green offers no compelling argument that he was constructively discharged, nor does he relate the alleged "resign or be terminated" communication to his FMLA claim.

Green's second contention is that the City interfered with his FMLA rights because he should have been allowed to work light duty. He posits that "individuals who have not taken FMLA leave have been allowed to work light duty for years," and he cites 29 C.F.R. § 825.220(c) in support of his argument that the FMLA's prohibition against "interference" prohibits an employer from discriminating or retaliating against an employee for having exercised or attempted to exercise FMLA rights. Thus, he concludes, "whether termed as retaliation or interference, the City has treated others more favorably in terms of light duty, denied [Green] the

benefits of the policy, and denied [Green] his full 12–week entitlement under the FMLA" because he was "forced to resign before his FMLA was exhausted."

We note several problems with Green's argument. First, despite his protestations in his reply brief to the contrary,[5] the gist of his claim is that he was entitled to light-duty work but was denied it. In Green's December 7, 2010 deposition, attached as an exhibit to his response to the City's motion for summary judgment, the following exchange occurred:

Q: Your claim—your claim at FMLA is that you were denied light duty, correct?

A: Yes.

Similarly, in Green's affidavit, also attached as an exhibit to his response to the City's motion for summary judgment, he states that the City "denied me the benefit of the FMLA *by depriving me of light duty*." (Emphasis added.) Thus, it is apparent that his FMLA-interference claim is premised on the City's alleged refusal to allow him to perform a light-duty job.

 Under the FMLA, however, there is no entitlement to light-duty work. *See generally* 29 U.S.C. § 2612; *Hendricks v. Compass Group, USA, Inc.*, 496 F.3d 803, 805 (7th Cir.2007) ("There is no such thing as 'FMLA light duty' whether pursuant to the statutes or their corresponding regulations."). If there is no entitlement to light-duty work under the FMLA, Green's rights under the Act could not have been violated by any alleged refusal to provide him with such work.

Second, the chronology of this case belies Green's arguments. Green was injured on December 10, 2007, and he applied for duty-disability retirement on December 12, 2007. When Green's treating physician released him to work effective

January 28, 2008, Captain Bridges began filling out the necessary paperwork to allow Green to work a light-duty position on February 4, 2008. Green then submitted his letter of resignation to Bradley on February 8, 2008, stating that he would like his resignation to be effective on February 22, 2008. Although Bradley initially approved Green's light-duty paperwork, when the chief received Green's resignation letter, Bradley rescinded that decision on February 15, 2008, reflecting that if Green was going to retire, he would not be eligible for light-duty work, which was only available for employees who intended to return to work.

It is apparent from this timeline that Green decided to retire on February 8, 2008, and the decision that he would not be approved for light-duty work was not made until February 15, 2008. As such, we cannot agree with Green that the rescinding of the light-duty approval was the event that triggered Green's decision to retire. That is, as Green had decided to resign *prior* to the decision to decline his request for light-duty work, the denial of light duty could not have been the cause of Green's resignation. Green simply was not "forced" to resign as a result of anything having to do with the exercise of his FMLA rights; in fact, the record demonstrates that he was not "forced" to resign at all.

 As there were no violations of Green's FMLA rights, we find it unnecessary to determine whether the City is entitled to qualified immunity. A motion for summary judgment based on qualified immunity is precluded only when the plaintiff has asserted a constitutional violation, has demonstrated the constitutional right is clearly established, and has raised a

5. At page 5 of his reply brief, Green maintains that he "has never argued that the FMLA provides him with an independent entitlement to light duty."

genuine issue of fact as to whether the official would have known that the conduct violated that clearly established right. *Smith v. Brt*, 363 Ark. 126, 211 S.W.3d 485 (2005); *Baldridge v. Cordes,* 350 Ark. 114, 85 S.W.3d 511 (2002). Here, there was no conduct on the part of the City or its employees that violated any of Green's constitutional rights; accordingly, the circuit court correctly granted summary judgment on this issue.

Affirmed.

PITTMAN and WYNNE, JJ., agree.