
# ARKANSAS COURT OF APPEALS

DIVISION III
No. CR–14–936

| | |
|---|---|
| | **Opinion Delivered** December 9, 2015 |
| JACK W. GILLEAN<br>APPELLANT | APPEAL FROM THE FAULKNER COUNTY CIRCUIT COURT [NO. CR-2012-1044] |
| V. | |
| STATE OF ARKANSAS<br>APPELLEE | HONORABLE CHARLES E. CLAWSON, JR., JUDGE |
| | AFFIRMED |

## BART F. VIRDEN, Judge

Jack Gillean was convicted in the Faulkner County Circuit Court of six counts of commercial burglary after a trial by jury. He was sentenced to three years in the Arkansas Department of Correction (ADC) and was ordered to pay a fine of $10,000 on count I; on counts II-VI he was sentenced to ten years of probation on each count, and he was ordered to pay fines totaling $25,000.

### I. *Facts*

In the summer of 2010, Jack Gillean, former Chief of Staff of the University of Central Arkansas (UCA), and Cameron Stark, a student at UCA, formed a friendship. From February 2011 to June 2012, Stark used Gillean's keys and entry card to enter UCA buildings and several of his professors' offices for the purpose of obtaining exams. In June 2012, Stark was arrested by the UCA police for stealing the prescription drug Adderall from Professor Andrew Linn's office. When confronted by UCA police, Stark told the police

1

officer that in the spring of 2011 Gillean had willingly given him the keys on several occasions, and that Gillean knew Stark's intent was to obtain exams in advance of his upcoming tests. In exchange for immunity from prosecution, Stark agreed to testify against Gillean. As a part of the immunity agreement, Stark gave the UCA police the keys and two phones he had used to text Gillean and others during the spring of 2011.

The original criminal information was filed on October 5, 2012. In response to defense counsel's motion, the circuit court directed the State to provide in its pleading the name of the buildings on the UCA campus Stark entered, the dates the instances occurred, and the items that were taken or attempted to be taken at the time of the incident. A third and final amended information against Gillean was filed on February 20, 2014. It set forth six counts of commercial burglary as occurring in buildings on the UCA campus on specific dates. On each count, the underlying crime was listed as theft of property, and the property alleged stolen was stated as "exam."

The day before the trial a motion hearing was held. At this hearing defense counsel requested that the circuit court exclude certain evidence, namely, testimony that Gillean had a sexual relationship with Ryan Scott, testimony that Gillean and Stark had consumed alcohol together, and testimony concerning Gillean's response to questions posed to him by UCA President Tom Courtway. The motion was denied.

The trial took place March 7–11, 2014, before a Van Buren County jury.[1] Counsel for both parties conducted voir dire and questioned the potential jurors extensively. When

---

[1] On February 28, 2013, Gillean filed a motion for change of venue from the Faulkner County Circuit Court to the Van Buren Circuit Court because of extensive negative

defense counsel asked the jury panel if any of them had read or heard anything about the case in the media, one potential juror responded that she was familiar with the case from reading newspaper articles and had already begun to form an opinion on the merits. She also indicated that she was not sure she could be unbiased because of her strongly held religious beliefs concerning homosexuality. The potential juror was eventually excused for cause. Other jurors stated in response to questioning that though they had some negative feelings about homosexuality in general, they could be fair and unbiased.

At the trial, Stark testified against Gillean. He testified that he and Gillean became friends during the summer of 2010 and that in the fall Gillean helped Stark get a job in the office of the president of UCA. On February 11, 2011, UCA was closed due to snow. Stark testified that he and Gillean were together driving around the campus when he asked Gillean if they could get into his cell-biology professor's office in the Lewis Science Center to obtain the upcoming exam for which Stark confessed he was not prepared. Stark testified that Gillean let him into the building and then into Dr. Bhupinder Vohra's office, and that he waited outside the professor's office while Stark searched for the exam on Dr. Vohra's computer. Stark testified that he found the files for both the upcoming exam and some older exams, and he printed off copies of all of them.

After Stark acquired the exams, he enlisted two other classmates to answer the questions on the exams. Stark testified that over the next three months there were five

_____

coverage of the case in the media. Gillean filed an amended motion for change of venue on May 6, 2013, requesting that the circuit court move the trial to the Searcy County Circuit Court because he had discovered that the negative publicity had "saturated the potential jury pool in Van Buren County as well." On June 3, 2013, the circuit court entered an order moving the trial to the Van Buren County Circuit Court.

subsequent instances when Gillean gave Stark his keys and sometimes his entry card, or "slide card", so that Stark could enter the Lewis Science Center and Laney Hall, which housed two other professors' offices, in order to obtain copies of exams. In his testimony Stark described the manner in which he obtained each test and details about where in each of the professors' offices the tests were located. All three professors testified at the trial as to the manner in which they stored their tests in their offices. Stark's description of the location of the tests mirrored the testimony given by each professor. Stark also testified about a particular incident prior to a March 7, 2011 exam in Dr. Menon's physics II class. When Stark tried to enter Dr. Menon's office, the key would not work. Stark testified that Gillean had a new key made at his request, and that Stark used the new key on March 31, 2011, to enter Dr. Menon's office to obtain an exam.

Jared Santiago, one of Stark's classmates who participated in answering the exam questions with Stark, testified at the trial in exchange for immunity from prosecution. Santiago recounted for the jury the events of February 11, 2011, when Stark came to his dorm room and showed him the exams he had just taken from Dr. Vohra's office. He testified that Stark told him that he had been riding around the campus with Gillean that day; that Gillean told Stark that he had a key that would open any door on campus; and that they could get the key from Gillean when they wanted it. Santiago testified that Stark told him that he and Gillean had gone to Dr. Vohra's office, and Stark printed off copies of the upcoming test. Santiago testified that the two agreed to solve the test questions together. Santiago explained to the jury that Stark had told him that he and Gillean were friends and that he could get Gillean's key and entry card to obtain tests in the future. Santiago described

breaking into Dr. Tarka's office with Stark and that the tests in that instance were on Dr. Tarka's desk in a stack. On that occasion, Santiago described how they had copied the exam and then restapled the exam and placed it back into the center of the stack. Santiago identified State's exhibit 8 as the exam they had taken from Dr. Tarka's office that night. Santiago also recounted the incident when the key did not work for Dr. Menon's office and recalled that Stark had told him that Gillean had obtained a new key from the maintenance office. Santiago testified that Stark did not always have the key during that semester but that he asked for it as he needed it.

Santiago also recounted an occasion when they were not able to get Gillean's key because Stark had angered Gillean by wrecking his motorcycle. Santiago testified that after they could not find Gillean's key in his truck, which was parked at the airport while Gillean was out of town, Santiago encouraged Stark to do whatever was necessary to patch things up with Gillean. Santiago testified that, after the 2011 spring semester, Stark took the key from Gillean and did not give it back to him.

Two employees of UCA's physical plant also testified for the State: George McKee identified the keys Stark had given to UCA police as Gillean's, and he also identified to which buildings the keys corresponded. William K. Manning testified about the automatic reports created anytime an entry card is used to enter UCA buildings and that these reports showed that Gillean's card had been used on the dates and at the times Stark testified he had entered Laney Hall to obtain exams. Manning also testified that Gillean reported that he had lost his "grandmaster" key that opened all the buildings on the UCA campus, and that

Gillean had requested a new grandmaster key. Manning identified a document dated March 7, 2011, as the record of that request and that the document had been signed by Gillean.

Jeff Scarborough, a former mentor to Stark and an acquaintance of Gillean, testified for the State. Scarborough explained that when he noticed that Stark was partying more than he had been previously and that Stark's grades were dropping, he confronted Stark. Scarborough explained that Stark responded by saying that he did not have to worry about studying anymore, and he confessed that he had been using Gillean's keys with Gillean's knowledge to enter faculty offices and to obtain upcoming exams. Scarborough testified that he confronted Gillean about his involvement and warned Gillean that his participation in Stark's activity could hurt his career. Scarborough testified that he and Gillean "talked about that a little bit and then he goes, 'I know. I know.'"

Tom Courtway, the president of UCA, testified for the State. Courtway stated that in either November or December 2011, he had a meeting with Gillean to discuss what course of action the university should take concerning Gillean's missing master key.

Courtway also testified about the events leading to Gillean's arrest. He testified that on June 12, 2012, he became aware of Stark's arrest and the allegations that Gillean had assisted him with the burglaries. Courtway put Gillean on administrative leave the next day. After listening to an audio-taped phone call from Jeff Scarborough corroborating the allegation that Gillean had willingly given Stark the master key, Courtway testified that he and Graham Gillis, the associate vice president of administrative services at UCA, met with Gillean. The meeting took place on June 15. Courtway testified that he told Gillean that he wanted him to listen to the recorded phone call. Courtway testified Gillean did not seem

SLIP OPINION

shocked or surprised when he explained that the recording presented a damaging statement about Gillean's possible involvement in Stark's criminal activity. Courtway testified that Gillean said, "I don't want to listen to it," and he requested that Courtway not play the recording. Courtway testified that he pressed Gillean again to listen to the recording and said to Gillean, "We've worked together a long time, and I want to give you every opportunity and I want you to argue with me if you feel like you need to about this audio tape and the contents of it, and everything else because I want to be fair." According to Courtway, Gillean responded, "Then I'll go ahead and resign." Courtway testified that Gillean left the meeting and tendered his resignation by email that same day.

Lastly, Courtway testified about the value of the integrity of exams to the university, and that it was "hard to put a number on" the value of those exams.

The State rested its case in chief, and defense counsel moved for a directed verdict on the commercial-burglary charges. First, defense counsel argued that the State had not proved that any thefts that had occurred amounted to felony theft and that misdemeanor theft did not satisfy the requirements of the statute. Defense counsel also argued that the State had not proved deprivation of property had occurred because of Stark's actions and that deprivation was essential to the definition of theft. The circuit court took the matter under advisement; after a hearing on the matter, the motion was denied.

The jury found Gillean guilty of all six counts of commercial burglary. Before the sentencing hearing began, defense counsel objected to the introduction of testimony from Detective Brian Williams who conducted the forensics testing of the two phones Stark had given to investigators upon his arrest. Williams had uncovered text messages between Stark

and Gillean showing that Gillean supplied Stark with marijuana on several occasions, and the State argued that the texts should be admissible to illustrate Gillean's close relationship with Stark. Defense counsel argued that the evidence was more prejudicial than probative. The motion was denied. Gillean was sentenced by the jury to three years in the ADC and was assessed a fine of $10,000 on count I. On counts II–VI, the jury sentenced Gillean to ten years' probation on each count and assessed $5000 on each count. This appeal followed.

## II. *Points on Appeal*

Gillean raises six points on appeal. We will address Gillean's fourth point on appeal, a challenge to the sufficiency of the evidence against him, first. Second, we will address Gillean's three points on appeal in which he challenges the admissibility of certain evidence. Third, we will address Gillean's assertion that the criminal information provided insufficient due-process notice of the criminal behavior of which he was accused. Last, we will address Gillean's assertion that the circuit court erred during the sentencing phase of his trial when it allowed testimony concerning his illegal-drug use.

## A. Sufficiency of the Evidence

Gillean challenges the sufficiency of the evidence of commercial burglary. Because of double-jeopardy concerns, we consider challenges to the sufficiency of the evidence before addressing other arguments. *Benjamin v. State*, 102 Ark. App. 309, 310-11, 285 S.W.3d 264, 266 (2008). A motion for a directed verdict is treated as a challenge to the sufficiency of the evidence. *Woodson v. State*, 2009 Ark. App. 602, at 7, 374 S.W.3d 1, 5. When the sufficiency of the evidence is challenged, we consider only the evidence that

SLIP OPINION

supports the verdict, viewing the evidence in the light most favorable to the State. *LeFever v. State*, 91 Ark. App. 86, 208 S.W.3d 812 (2005). The test is whether there is substantial evidence to support the verdict, which is evidence that is of sufficient force and character that it will, with reasonable certainty, compel a conclusion one way or the other. *Id.* On review, this court neither weighs the evidence nor evaluates the credibility of witnesses. *Cluck v. State*, 91 Ark. App. 220, 209 S.W.3d 428 (2005).

At the close of the State's evidence, Gillean moved for a directed verdict. In support of his motion for directed verdict, Gillean asserted that the State failed to prove Stark's intent to commit a felony. Gillean argued that the theft that occurred amounted to a misdemeanor at most because the State failed to put forth evidence proving the value of the exams such that the thefts would constitute a felony. Furthermore, Gillean argued that the State failed to prove the necessary element of deprivation of property because Stark took photos or photocopied the exams, and, except in one instance where Stark made a photocopy of the exam and left the professor's office with a few pieces of paper, he never actually removed any property from his professors' offices. We disagree, and we affirm.

Arkansas Code Annotated section 5–39–201(b), sets forth the elements of commercial burglary:

> (1) A person commits commercial burglary if he or she enters or remains unlawfully in a commercial occupiable structure of another person with the purpose of committing in the commercial occupiable structure any offense punishable by *imprisonment*.
> (2) Commercial burglary is a Class C felony.

(Emphasis added.) Misdemeanor theft is punishable by one year imprisonment. Ark. Code Ann. § 5-4-401(b). No minimum value is required for proof of misdemeanor theft of

property. *Reed v. State*, 353 Ark. 22, 29, 109 S.W.3d 665, 669 (2003). Theft of property is defined at Arkansas Code Annotated section 5-36-103(a) (Repl. 2006):

(1) A person commits theft of property if he or she knowingly takes or exercises unauthorized control over or makes an unauthorized transfer of an interest in the property of another person with the purpose of depriving the owner of the property;
(2) Or obtains the property of another person by deception or by threat with the purpose of depriving the owner of the property.

Arkansas Code Annotated section 5-36-103(b)(4)(B) (Repl. 2013) provides that theft of property is a class A misdemeanor if "the property has inherent, subjective, or idiosyncratic value to its owner or possessor even if the property has no market value or replacement cost." Property is defined as either tangible or intangible personal property, including any paper or document that represents or embodies anything of value. Ark. Code Ann. § 5-36-101(7). Deprive means to "[w]ithhold property or to cause it to be withheld either permanently or under circumstances such that a major portion of its economic value, use, or benefit is appropriated to the actor or lost to the owner." Ark. Code Ann. § 5-36-101(4).

First, we address Gillean's assertion that the predicate offense underlying the charges of commercial burglary must be a felony; therefore, the circuit court erred in denying his motion for a directed verdict. Gillean relies on *Holt v. State*, 2011 Ark. 391, 384 S.W.3d 498, in support of this assertion. In *Holt*, our supreme court held that the appellant's argument concerning the intent element of the residential-burglary statute was not preserved for its review, but in addressing the point on appeal, it stated that the residential-burglary statute required illegal entering with intent to commit a felony in the residence. *Id*. at 8,

384 S.W.3d at 505. Gillean argues that thus, our supreme court has interpreted the commercial-burglary statute to require intent to commit a felony.

Gillean's contention is incorrect for two reasons. First, because the court in *Holt* declined to reach the issue of intent, the interpretation of the residential-burglary statute is dicta, and our appellate courts are not bound by mere comments not intended as a decision of the court. *Green v. State*, 343 Ark. 244, 251, 33 S.W.3d 485, 490 (2000). Dicta includes any discussion or comment in an opinion that is unnecessary to the decision reached. *Id.* Secondly, since *Holt*, our court has held that misdemeanor theft of property is sufficient to support a burglary charge. *See Washington v. State*, 2013 Ark. App. 148, at 4 ("Since misdemeanor theft of property is an offense punishable by imprisonment, both elements of the commercial-burglary statute have been satisfied.") This holding reflects the plain language of the statute requiring that, to be found guilty of commercial burglary, one must enter the premises with the intent to commit a crime "punishable by *imprisonment*." Ark. Code Ann. § 5–39–201(b)(1) (emphasis added). We find no merit in Gillean's assertion that the commercial-burglary statute requires intent to commit a felony. Because misdemeanor theft is punishable by one year imprisonment, the circuit court did not err in finding that the requirements of the commercial-burglary were met.

Gillean also argues that the State failed to prove the value of the exams by not eliciting testimony describing the value from the professors whose exams were photocopied or photographed. In this way, Gillean asserts, the State impermissibly forced the jury to determine the value of the exams. *See Canon v. State*, 265 Ark. 270, 273-74, 578 S.W.2d 20, 22 (1979) ("We have heretofore rejected the idea that common knowledge and

11

experience could serve as a substitute for evidence of value which is a necessary element of a crime[.]")

The State called all of the professors whose exams had been stolen to testify. The State questioned Dr. Bhupinder Vohra, Stark's cell-biology professor in the spring of 2011, about the value of his exams:

> PROSECUTOR: Dr. Vohra, is there—as a professor in a university is there some value to you having those exams safe and not out in public domain?
>
> DR. VOHRA: Yeah, it should not be out because we are testing students on those exams. So it should not be out to anyone. So that's the value.
>
> PROSECUTOR: Kind of hard to put a number on it.
>
> DR. VOHRA: Oh, you can't put a number—those are—you can say those are invaluable and—because you are students based on that. Their future depends on that. So you cannot put value in time or money or anything . . . .

Dr. Richard Tarka, Stark's organic-chemistry professor in the spring of 2011, also testified and stated that he had never given anyone permission to take a test from his desk. The State then elicited his testimony as to the value of maintaining the secrecy of the contents of an exam:

> PROSECUTOR: And it may seem like a silly question, Dr. Tarka, but why— why would you not do that?
> DR. TARKA: . . . I'm trying to evaluate how well they've understood the material, and I have to have a level playing field for all the students, and if they have a copy of the test beforehand that gives them an unfair advantage.
> PROSECUTOR: It kind of undermines the—
> DR. TARKA: Absolutely, yeah.

Stark's former physics professor, Dr. Balraj Menon, also testified as to the inherent

value of the exams:

PROSECUTOR:     Alright. And why is it important to you to protect your exams?
DR. MENON:      Well, it is a fair evaluation of the students and I—and I think
                everybody should be given the—you know, have a fair chance
                of taking it and shouldn't—I don't want to give anybody an
                advantage—
PROSECUTOR:     Yes, sir.
DR. MENON:      --over anybody else, yes, yes.
PROSECUTOR:     Does that have some value to you as an instructor?
DR. MENON:      Absolutely, yes. These are my tests. These are questions that I
                come up with and those are my—yes.

President Courtway also testified that the integrity of the exams was inherently valuable

to an academic institution:

[A]t the core of any education institution stands for academic integrity that the public and the students and others have to know that a degree from that university is worth something and that as they go out into the world that they've earned their grades, they've passed their exams, and that the degree that they've received is valid and critical and important as they go through life.

Gillean argues that because the State failed to prove the replacement cost or monetary

value of the exams, and because the testimony elicited from the professors did not show the

inherent value or worth to the professors, value was not proved. We disagree. The

professors' testimony supported the State's assertion that the tests had inherent value to the

students, to the professors themselves, and to the university as an academic institution. No

minimum value was required to be shown, and we hold that the circuit court did not err in

finding that the State adequately proved that the owners of the exams were deprived of the

exams' inherent value, and that the value of the exams was appropriated to Stark when he

copied the information therein. On this point, we affirm.



A. Admissibility of Testimony

On appeal, Gillean asserts that during his trial the circuit court erred when it admitted testimony over his objection. Gillean challenges three instances of admitted testimony: (1) the circuit court allowed testimony that Gillean and Scott had a romantic relationship; (2) the circuit court allowed testimony that Gillean drank alcohol with Stark; and (3) the circuit court allowed testimony concerning Gillean's reaction when President Courtway tried to persuade Gillean to listen to a recorded statement concerning his role in Stark's criminal activity. We agree in part and disagree in part, and we hold that where the circuit court erred in admitting testimony, the error was harmless.

### 1. *Standard of review*

The decision to admit or exclude evidence is within the sound discretion of the circuit court, and this court will not reverse a circuit court's decision regarding the admission of evidence absent a manifest abuse of discretion. *Jones v. State*, 2011 Ark. App. 324, at 4, 384 S.W.3d 22, 24. An abuse of discretion is a high threshold that does not simply require error in the circuit court's decision but requires that the circuit court acted improvidently, thoughtlessly, or without due consideration. *Id.* Moreover, an appellate court will not reverse a circuit court's evidentiary ruling absent a showing of prejudice. *Id.*

### 2. *Applicable law*

Rule 401 of the Arkansas Rules of Evidence defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the

evidence." Ark. R. Evid. 401 (2015). Arkansas Rule of Evidence 402 further provides that "[e]vidence which is not relevant is not admissible." Ark. R. Evid. 402 (2015). For evidence to be relevant, it is not required that the evidence prove the entire case; rather, all that is required is that it have any tendency to make any fact that is of consequence to the determination of the action more or less probable. *Banks v. State*, 2010 Ark. 108, at 4-5, 366 S.W.3d 341, 343-44. However, relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. *See* Ark. R. Evid. 403 (2015). *Morris v. State*, 358 Ark. 455, 458, 193 S.W.3d 243, 246 (2004).

a. Gillean's and Scott's romantic relationship

Gillean asserts that the testimony concerning his relationship with Scott was both irrelevant, and alternatively, if the evidence was relevant, that the probative value of the testimony was outweighed by its prejudicial impact. We hold that the circuit court erred in finding that testimony concerning Scott's and Gillean's romantic relationship was relevant.

At Gillean's trial, Scott testified that when he was living in Gillean's home in the spring of 2011, he witnessed Gillean give Stark his keys, and that he heard the two of them discussing the key exchange on several occasions. Scott recalled for the jury that he had advised Gillean against helping Stark obtain the exams, but that Gillean responded that he did not care. Scott also testified that after Stark's motorcycle accident, Gillean was angry with Stark. Scott testified that during this hiatus in Gillean's and Stark's friendship, Gillean instructed Scott that, while Gillean was out of town, Scott should not give Stark the keys if he asked for them.

SLIP OPINION

None of the testimony offered by Scott related to his romantic relationship with Gillean and could have been offered by any roommate who lived in Gillean's household. Scott's sexual relationship with Gillean did not place him in any better position to observe the events that led to criminal charges being brought against Gillean. The nature of their relationship is immaterial to the testimony offered by Scott, and therefore we hold the circuit court erred in allowing irrelevant evidence; however, even when a trial court errs in admitting evidence, our supreme court has held that when the evidence of guilt is overwhelming and the error is slight, we can declare that the error was harmless and affirm the conviction. *Cobb v. State*, 340 Ark. 240, 246, 12 S.W.3d 195, 199 (2000).[2]

### i. *evidence of guilt*

Upon our review of the evidence, we hold that the requirement of the first prong of the harmless-error analysis—overwhelming evidence of guilt—was met. At the trial, Stark explained that initially, during the 2011 spring semester, he had used his friendship with Gillean to get the keys from him, but eventually Stark came into possession of the keys by simply keeping them after he woke up with the keys one morning after a night of drinking with Gillean. Jared Santiago testified at trial that Stark had told him of Gillean's knowingly giving him the keys, and Santiago described breaking into their professor's office together to copy an exam. Dr. Vohra identified the stolen test, and Santiago corroborated that the break-in occurred the day before the test was given. Dr. Tarka testified that he had printed the tests out the day before and left them on his desk. Dr. Tarka's testimony about the

---

[2] Because we agree that the testimony concerning their romantic relationship was irrelevant and therefore inadmissible, we need not address the issue of probity.

placement of the tests in his office matched the testimony of both Stark and Santiago about the manner in which they obtained Dr. Tarka's test and where they found the test in his office.

Testimony from the employees of UCA's physical-plant department also supported the State's case against Gillean. William K. Manning offered testimony specifying the dates that the automatic reports were created when Gillean's entry card had been used to enter the UCA buildings. The dates Manning cited corresponded with Stark's accounts of when he used Gillean's card to enter the same buildings to obtain the exams. Manning's testimony concerning his conversation with Gillean about getting a new key made also supported Stark's testimony that Gillean had another key made when the one Gillean gave Stark did not work properly. Manning identified the key-request form that Gillean had filled out, dated, and signed.

Scott's testimony supported the State's assertion that Gillean was aware of Stark's burglary and intent to procure exams. Scott testified that, after the motorcycle accident, Gillean instructed Scott to refuse to give Stark the keys if he asked for them. Scott testified that he counseled Gillean against helping Stark and that he witnessed Gillean give Stark the keys upon his request.

Jeff Scarborough testified that Stark confided in him that he was using Gillean's keys to steal exams and that when Scarborough confronted Gillean about it, Gillean did not deny the allegations, and he stated, "I know. I know." In light of the evidence presented against Gillean, we hold that the requirement of the first prong of the harmless-error test has been met.

ii. *prejudice*

We now turn to the second prong of the harmless-error analysis: whether the error in allowing the evidence was slight. In determining whether the error is harmless, the appellate courts look to see if the appellant was prejudiced by the erroneously admitted evidence; prejudice is not presumed, and a conviction will not be reversed absent a showing of prejudice. *Rodriguez v. State*, 372 Ark. 335, 276 S.W.3d 208 (2008).

During voir dire, defense counsel questioned the potential jurors about what they had heard and read in the media. One potential juror explained to the court that she had read several newspaper articles and recited some of the facts of the case and also some conclusions she had drawn from reading the articles. She told the court that she not only had a preformed opinion about the merits of the case, but she also felt that she could not be fair to Gillean because he was a homosexual. She was excused for cause. Defense counsel followed up on the issue with the remaining potential jurors by extensively questioning them about their beliefs and attitudes toward homosexuality and whether their beliefs would prevent them from being unbiased toward Gillean:

| | |
|---|---|
| DEFENSE COUNSEL: | Do any of you have feelings like that? I mean, is there something that could come out about Jack in this trial, about the way he lives, whatever, that just makes you say, "Oh, my god, no way. He did that. He's guilty of what he's charged with." Mr. Howard, you seem to be studying that. |
| POTENTIAL JUROR: | Well, I'm apostolic. |
| DEFENSE COUNSEL: | Well, I apostolic, too. |
| POTENTIAL JUROR: | But, we'll let the Lord clean them up. |
| DEFENSE COUNSEL: | I'm sorry? Let the Lord— |

POTENTIAL JUROR:   Let the Lord clean them up.

DEFENSE COUNSEL:   Clean them up?

POTENTIAL JUROR:   We're not judging. Let the Lord clean them up.

DEFENSE COUNSEL:   All right. Well, let me get specific with you. You are going to hear evidence in this case that Jack Gillian had a sexual relationship with another man. How do you feel about that, Mr. Howard?

POTENTIAL JUROR:   That's not what he's on trial for.

. . . .

DEFENSE COUNSEL:   Mr. Howard, can you put aside what the Bible teaches and apply the law that the Judge says you have to apply?

POTENTIAL JUROR:   Yes, I can. Yes, I can.

DEFENSE COUNSEL:   Let me—I'm sorry, but this issue concerns me a lot so I'm going to ask you a couple of more questions on that.

. . . .

DEFENSE COUNSEL:   Mr. French, how would you feel if a gay or lesbian couple bought the house next to you?

POTENTIAL JUROR:   Well, I may be different, but as long as it didn't affect me, I wouldn't have a problem.

DEFENSE COUNSEL:   Ms. Pelzer, how about you?

POTENTIAL JUROR:   Considering the fact it wouldn't bother me; okay? I have friends or what I consider friends—I don't think I'm—it wouldn't bother me. Let's just leave it at that.

DEFENSE COUNSEL:   Okay. Ms. Griggs, let me ask you. Do you think an employer should have the right to refuse to hire somebody because of their sexual orientation?

POTENTIAL JUROR:   No, that's discrimination.

DEFENSE COUNSEL:   Ms. Madison, I think I know your answer to this question. If somebody you worked with closely was gay or lesbian, would that bother you at all?

POTENTIAL JUROR:    I've had. It doesn't bother me.

POTENTIAL JUROR:    About the only thing I would have said was would I have a problem with somebody that's homosexual living next to me. Not if they kept it to themselves. But if they threw it in my face, I'd have a problem with it. But if they kept it to themselves, I don't have a problem with that.

DEFENSE COUNSEL:    Okay. Anybody else?

POTENTIAL JUROR:    And when I say that, I mean, like, come into my house and, like, forcing me to accept their lifestyle. That's what I mean when I say that.

DEFENSE COUNSEL:    Sure. Wouldn't have a problem working with one closely?

POTENTIAL JUROR:    No, sir. No, nothing like that. I just don't want them to throw that in my face.

DEFENSE COUNSEL:    Well, I was going to deal with that later, but he brought it up, so let's deal with it right now. Do any of you have religious beliefs that homosexuality is wrong?

(Several jurors raise their hands.)

DEFENSE COUNSEL:    Most of you do. And you heard me talk about God's law and man's law. Are there any of you who would feel obligated to find Jack Gillean guilty in this case because of your religious beliefs?

(No audible response.)

DEFENSE COUNSEL:    Can all of you assure me that whatever you believe about homosexuality that you can decide this case solely on the evidence that's presented in the courtroom and the law that the Judge gives you in this case?

(No audible response.)

DEFENSE COUNSEL:    I got your solemn oath on that. Cause I'll tell you, that's my biggest worry in this case is that Jack will get convicted because of homosexual conduct not because

of what he's charged with in the case. Do y'all promise me you can do that?

(Jurors nod heads up and down.)

The voir dire reveals that even though some jurors held negative views about homosexuality in general, they all came to the conclusion that they could be fair and try the case on its merits. It has been long held that jurors are presumed unbiased and qualified to serve. *Howard v. State*, 367 Ark. 18, 36, 238 S.W.3d 24, 39 (2006), and with that in mind, we find no error.

At the pretrial hearing, defense counsel presented evidence in the form of studies that indicate that prejudice against homosexuals is inherent in conservative communities like Van Buren County. Defense counsel also cited caselaw from our jurisdiction and others in which the courts have recognized prejudice that arose from attitudes toward homosexuality. Though Gillean makes a common-sense argument that evidence of homosexuality is inherently prejudicial—and even points to instances in which prejudice has been found—he has not demonstrated actual prejudice in the present case. In light of the overwhelming evidence of Gillean's guilt and in an absence of a showing of prejudice, we hold that the circuit court's error in admitting the irrelevant testimony concerning Gillean and Scott's homosexual relationship was harmless.

a. Consumption of alcohol

Gillean contends that the circuit court erred in allowing the introduction of evidence that Gillean and Stark drank socially at Gillean's home and at various events, and the evidence only served to negatively influence the jury's perception of Gillean's character. We disagree, and on this point we affirm.

21

The testimony concerning Gillean's alcohol consumption was relevant evidence within the scope of Rule 401 because it tends to show the familiar, social nature of Gillean's relationship with Stark—a fact that is of consequence to the determination of whether Gillean conspired to commit commercial burglary in order to help his friend gain access to his upcoming exams. The evidence that Gillean and Stark drank socially together also supported the State's assertion that after a night of drinking with Gillean, Stark woke up with the keys in his possession. The evidence of the two drinking together illustrated how Stark used his familiarity with Gillean to gain access to the keys and that ultimately Stark did not know exactly how he came into possession of Gillean's keys. Because the testimony concerning Gillean's alcohol consumption with Stark demonstrates their friendship, and the charges against Gillean involve intent that would have arisen out of their friendship, the circuit court did not err in allowing the evidence.

b. Gillean's reaction

Gillean's final challenge to the admissibility of evidence during the trial concerns President Courtway's testimony describing Gillean's reaction to his request that Gillean listen to a recorded phone call concerning his involvement in Stark's illegal activities. Gillean asserts that the testimony was highly prejudicial and that the resulting prejudice outweighed the probative value; alternatively, Gillean argues that the introduction of the evidence violated his Fifth Amendment right against self-incrimination. We disagree, and on this point we affirm.

On June 15, 2011, two days after Courtway placed Gillean on administrative leave due to the allegations against him, Courtway requested a meeting with Gillean and Dr.

Graham Gillis, vice-president of academic affairs. At the meeting, Courtway asked Gillean to listen to a recorded phone call from Jeff Scarborough in which Scarborough described Gillean's involvement in Stark's illegal activities. Gillean responded that he did not want to listen to the recording. Courtway explained to Gillean that he wanted to be fair and give Gillean a chance to defend himself. In response, Gillean stated, "Then I'll go ahead and resign." Gillean left the meeting shortly thereafter and tendered his resignation that same day.

*i. relevance*

In *Gaines v. State,* 340 Ark. 99, 110, 8 S.W.3d 547, 554 (2000) (internal citations omitted), our supreme court held as follows:

> Under the *res gestae* exception, the State is entitled to introduce evidence showing all circumstances which explain the charged act, show a motive for acting, or illustrate the accused's state of mind if other criminal offenses are brought to light. Specifically, all of the circumstances connected with a particular crime may be shown to put the jury in possession of the entire transaction . . . . *Res gestae* evidence is presumptively admissible.

We hold that the circuit court was within its discretion to overrule Gillean's Rule 401 and 403 objections and to allow Courtway to testify about what had occurred before Gillean's arrest when Gillean was confronted with evidence of his guilt. The evidence was relevant to inform the jury of the circumstances that led up to Gillean's resignation and to his arrest. Courtway's testimony concerning Gillean's reaction—that Gillean did not deny the allegations and voluntarily resigned from his job—allowed the jury to understand the events that led to Gillean's resignation and to formal charges being filed against him.

23

*ii. Fifth Amendment*

At the pretrial hearing, defense counsel asserted that Courtway's testimony concerning Gillean's reaction to Courtway's request to listen to the recorded phone call was inadmissible as a violation of Gillean's Fifth Amendment protection against self–incrimination. The State responded that Gillean was not in custody, nor did Gillean unequivocally invoke his right to remain silent; therefore, he could not object to Courtway's testimony on Fifth Amendment grounds. Gillean asserted that he fell under the exception to both the requirement that the witness be in "custody" and that the Fifth Amendment protection against self-incrimination be invoked unequivocally. The circuit court agreed with the State, and it denied the motion to exclude Courtway's testimony. We find no error, and on this point we affirm.

The Fifth Amendment to the United States Constitution provides that "no person . . . shall be compelled in any criminal case to be a witness against himself." The privilege against self-incrimination "is an exception to the general principle that the Government has the right to everyone's testimony." *Salinas v. Texas*, 133 S. Ct. 2174, 2178 (2013).

In *Miranda v. Arizona*, 384 U.S. 436, 444 (1966) the United States Supreme Court held as follows:

> [T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from *custodial* interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.

The Supreme Court set the parameters of the Fifth Amendment privilege against self-incrimination:

> [T]he Fifth Amendment privilege is available outside of criminal court proceedings and serves to protect persons in all settings in which their freedom of action is curtailed in any significant way from being compelled to incriminate themselves.

Our supreme court has also defined the term "custody" as "when he [a person] is deprived of his freedom by formal arrest or restraint on freedom of movement of the degree associated with formal arrest." *Hall v. State*, 361 Ark. 379, 389, 206 S.W.3d 830, 837 (2005). In resolving the question of whether a suspect was in custody at a particular time, the only relevant inquiry is how a reasonable man in the suspect's shoes would have understood his situation. *Id.* The initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being interrogated. *Id.*

Gillean argues that the meeting on June 15 between him, Courtway, and Gillis amounted to custody. To support his assertion, Gillean asserts that the circumstances of the June 15 meeting are analogous to the facts presented in *Garrity v. New Jersey*, 385 U.S. 493 (1967). In *Garrity*, police officers from certain boroughs of New Jersey were being investigated for involvement in "fixing" traffic tickets. When they were questioned by investigators from the Attorney General's office, they were given a choice: either incriminate themselves by answering investigator's questions or forfeit their jobs under New Jersey statute dealing with forfeiture of office or employment, tenure, and pension rights of persons refusing to testify on grounds of self-incrimination. The appellants in *Garrity* answered the questions, and their answers were used against them in subsequent prosecutions for conspiracy to obstruct the administration of the traffic laws. The officers were convicted, and on appeal they argued that that their statements were coerced "by

reason of the fact that, if they refused to answer, they could lose their positions with the police department." *Id.* at 495. The Court agreed:

> The choice imposed on petitioners was one between self-incrimination or job forfeiture. Coercion that vitiates a confession . . . can be 'mental as well as physical'; 'the blood of the accused is not the only hallmark of an unconstitutional inquisition.' Subtle pressures may be as telling as coarse and vulgar ones. The question is whether the accused was deprived of his 'free choice to admit, to deny, or to refuse to answer.'

*Id.* at 496 (internal citations omitted).

We hold that *Garrity* is inapposite to the present case. Gillean has not presented evidence to support his assertion that he was subject to the same kind of coercion as the appellants in *Garrity*. Neither Courtway nor Gillis threatened him with removal from his position during the meeting, and Courtway encouraged Gillean to argue with him and defend himself. Ultimately, Gillean voluntarily resigned from his position without prompting. We cannot say the circuit court abused its discretion in allowing Courtway's testimony concerning Gillean's reaction to his request that Gillean listen to the recording; therefore, we find no error, and we affirm.[3]

---

[3] Gillean asserts that *Green v. City of North Little Rock*, 2012 Ark. App. 21, 388 S.W.3d 85 supports his argument that he was questioned under threat of removal. In *Green*, our court held as follows:

> The Fifth and Fourteenth Amendment right protected in *Garrity*, however, is the privilege to be free from being compelled to communicate or otherwise provide testimony. Giving a blood or urine sample for drug testing does not violate that privilege. *Garrity* simply has no application in this situation, and Green's arguments to the contrary are unavailing. In short, we conclude that the trial court correctly granted the City's motion for summary judgment on this issue.

*Id.* at 15 (internal citations omitted). *Green* involved drug-testing an officer during an investigation. A blood sample does not constitute "testimony." *See Schmerber v. California*, 384 U.S. 757, 764 (1966). This court held that there was no violation of Green's Fifth

### B. Due Process

Gillean asserts that the criminal information did not give him adequate notice that his conduct amounted to the crime of being an accessory to burglary for the purpose of committing theft of property; therefore, his due-process rights were violated. The crux of Gillean's argument is that because the criminal information listed "exam" as the property stolen, Gillean had inadequate notice that Stark's stealing of *information*, not the exams themselves, constituted theft. Thus, Gillean argues he was forced to speculate as to the charges against him, and he was not given fair notice of what the State would attempt to prove at his trial. We disagree, and on this point we affirm.

It is axiomatic that due process requires that the defendant be provided sufficient notice of the precise criminal charges brought against him and that he must have adequate opportunity to prepare his defense. *Johnson v. State*, 71 Ark. App. 58, 69, 25 S.W.3d 445, 452 (2000).

The criminal information listing the charges against Gillean was amended three times, and the final amended felony information was filed on February 20, 2014. In it, the State listed six commercial-burglary charges predicated on theft of property. Each charge listed the date of the incident and the building on the UCA campus in which the alleged criminal activity occurred. An "exam" was listed as the property stolen for each charge.

Gillean's due-process argument is closely related to his challenge to the sufficiency of the evidence in that he relies on *Holt*, *supra*, to support his argument that "if the

---

Amendment privilege against self-incrimination, and thus, we do not agree with Gillean's assertion that *Green* applies to the present case.

commercial burglary elements included anything less than felony theft, [then he] was not given adequate notice that his conduct was criminal and was therefore denied due process."

We hold that the circuit court did not err in finding that Gillean was sufficiently informed of the charges against him. For the reasons we stated in our discussion of *Holt*, *supra*, we affirm on this point.

## B. Sentencing Evidence

Gillean argues that, during the sentencing phase, the circuit court erred in admitting testimony concerning Gillean's marijuana use, and the admission resulted in prejudice. We review a circuit court's decision to admit evidence in the penalty phase of a trial for an abuse of discretion. *Holley v. State*, 2014 Ark. App. 557, at 8, 444 S.W.3d 884, 889. We will reverse a sentencing decision only if the defendant can show that he was prejudiced by the erroneously admitted evidence. *Wilson v. State*, 100 Ark. App. 14, 15, 262 S.W.3d 628, 629 (2007). The pivotal legal point, however, is that our court need not decide the issue if the appellant cannot establish prejudice from the admission of the evidence during sentencing. *Holley*, *supra*. A defendant who is sentenced within the statutory range—and short of the maximum sentence—cannot establish prejudice. *Tate v. State*, 367 Ark. 576, 583, 242 S.W.3d 254, 261 (2006) (declining to decide alleged sentencing-phase error because the defendant received less than the maximum sentence and therefore could not establish a prejudicial error).

Therefore, to show that the circuit court abused its discretion by allowing evidence of Stark's and Gillean's use of marijuana was reversible error, Gillean must show that prejudice resulted from the admission of the evidence. The minimum sentence for

28

commercial burglary is three years. Ark. Code Ann. § 5-4-401(a)(4). Gillean's sentence was three years on the first count and ten years' probation on each of the remaining counts. Because Gillean was sentenced to the minimum sentence on the first count and to probation on the remaining counts, he cannot establish prejudice. On this point we affirm.

### III. *Conclusion*

We hold that the circuit court did not err in denying Gillean's motion for a directed verdict. Though we find error in the circuit court's admission of testimony concerning the relationship between Scott and Gillean, we hold that the error was harmless. As to the alcohol-related testimony and the testimony concerning Gillean's reaction to the recorded statement, we find no error. We hold that the circuit court did not err in finding that the criminal information sufficiently informed Gillean of the charges against him. Lastly, we find that the circuit court did not err during the sentencing phase in admitting evidence related to Gillean's marijuana use. We affirm.

Affirmed.

KINARD and HOOFMAN, JJ., agree.

*Timothy O. Dudley*, *Nicki Nicolo*, and *Samuel A. Perroni*, for appellant.

*Leslie Rutledge*, Att'y Gen., by: *Valerie Glover Fortner*, Ass't Att'y Gen., for appellee.

29