KENNETH S. HIXSON, Judge
Appellant Alberto Damien Chavez appeals after he was convicted by a Sebastian County Circuit Court jury of murder in the second degree and seven counts of committing a terroristic act. Each count was additionally enhanced because the *272 jury found that he employed a firearm during the commission of each felony. He was sentenced to serve a total of 110 years' imprisonment. On appeal, appellant contends that (1) the trial court erred in denying his motion to suppress and admitting the video of his interrogation at the Fort Smith Police Department into evidence; (2) the trial court erred in denying his motions for directed verdict; (3) the trial court erred in refusing to instruct the jury on the lesser-included offense of manslaughter; and (4) the trial court erred in substituting an alternate juror for a juror who had a health issue after deliberations had already started. We affirm.
I. Relevant Facts
In summary, appellant shot the victim, Justin Lopez, in a gang-related shooting on January 14, 2017. On that night, appellant, Ryan Oxford, Bryan Porras, and Jorge Chirinos traveled to a trailer in Fort Smith where rival gang members, Lopez and Trey Miller, were inside. The gang members fired over forty shots with an AK-47 rifle (AK-47) and an AR-15 rifle (AR-15), and one of those rounds penetrated the trailer and killed Lopez. Appellant gave incriminating statements to law enforcement about the incident during a recorded interview, and he was subsequently arrested. Appellant was charged with murder in the first degree and seven counts of committing a terroristic act. He was also charged with enhancements for employing a firearm during the commission of each felony charge.
Appellant filed a motion to suppress his statements and any resulting evidence. Appellant alleged that the statements he made to law enforcement were not voluntarily obtained and that he did not make a knowing and intelligent waiver of his Miranda rights. The State responded that appellant's statements were voluntary. The State explained that Detective Bill Hardin began the interview by going over the "Interrogation Advice of Rights" form and that appellant initialed that he understood each right and signed at the bottom of the form, indicating that he was waiving his rights. Therefore, based on the totality of the circumstances, the State contended that appellant made a knowing and intelligent waiver of his Miranda rights and that appellant's motion should be denied.
At the hearing on the motion to suppress, appellant's counsel argued that appellant claimed that he was under the influence of intoxicating substances, including alcohol, morphine, Lorazepam, and marijuana, at the time he gave his statement. Counsel additionally argued that law enforcement improperly made promises of leniency in return for appellant's statement.
Detective Anthony Parkinson testified at the suppression hearing that he developed appellant, Oxford, Porras, and Chirinos as possible suspects in Lopez's murder after he spoke with several guests at a wedding party held at the Fort Smith Convention Center. Other guests at the wedding told the detective that the four possible suspects were members of a gang named the "Slangez" and that just before the shooting, they were asking guests at the party about the whereabouts of the "Clout Boyz," a rival gang. After the shooting, Detective Parkinson interviewed appellant at the police department. Appellant was read his Miranda warnings from the "Fort Smith Police Department Advice of Rights Form." Detective Parkinson stated that appellant initialed by each of his rights and signed the bottom of the form, indicating that he was waiving his rights. Detective Parkinson admitted that he used "street language," which included using curse words, in order to make appellant feel more comfortable during the interview.
*273 The detective denied making any promises to appellant other than the fact that he would inform the prosecuting attorney everything that appellant told him in the interview. He testified that appellant did not appear to be under the influence of drugs or alcohol at the time of the statement, nor did appellant tell him that he was under the influence of any drugs or alcohol. A video of the interview and a copy of the transcript were introduced into evidence.
After hearing the evidence and argument of counsel, the trial court denied appellant's motion to suppress. The trial court found that law enforcement did not make any promises of leniency or coerce appellant to make the statement. The trial court further found that appellant's self-serving claim that he was under the influence of drugs and alcohol lacked merit.
A jury trial was held, and several witnesses, including Trey Miller, Baldomero Hernandez, Jorge Chirinos, and law enforcement officers testified. Trey Miller testified that his friend, Lopez, was shot in a trailer that was located on the back of a piece of property in Fort Smith, Arkansas. Miller's grandmother, grandfather, sister, and nephew lived in the house that was located on the same property. Miller admitted at trial that Lopez, Roberto Aguilar, Sylvester Aguilar, and he were in a gang named "The Clout Boyz." Miller testified that on January 14, 2017, Lopez came to the trailer around 6:40 p.m. and that Lopez brought marijuana, a scale, and a shotgun with him. Two girls, Lopez's cousin (Roberto Aguilar), and Guadalupe Chavez-Rodriquez also came over to the trailer that night. Lopez sold marijuana to Aguilar and Rodriquez, and Miller admitted that he had smoked marijuana and drank beer. Miller testified that everyone, except Lopez and he, left by 9:30 p.m. that evening and that the shooting occurred about an hour or hour and a half afterwards. Miller testified that they were in the trailer when they saw a car pull up and heard someone approach. Lopez grabbed a shotgun, went toward the door, and asked who was there. Miller was able to see a "chubby guy" approaching in a gray hoodie. When no one answered, Lopez racked the shotgun. Miller testified that he saw the person take off running away from the door and heard him say "shoot, shoot, shoot, shoot." Lopez ran into the master bedroom, and Miller ran to the back of the trailer. Miller testified that he heard multiple shots and then screaming outside in what he described as celebration. Miller further testified that after the shootings subsided, he found Lopez lying on the floor in the bedroom.
Sherry McKinney testified that Trey Miller is her grandson and that Miller would stay in the trailer to hang out with his friends. McKinney explained that she woke up to the sound of gunshots around 10:30 p.m. Miller later told her that Lopez was dead. Although McKinney called the police, they were already en route, and she gave law enforcement consent to search everything in the area, including the trailer.
Jorge Chirinos testified at trial that he was a member of a gang called the "Slangez" with appellant, Oxford, Porras, and Roberto Castillo. Other names for the gang were "Slangez96," "Slangez Syndicate 96," or "S96." Chirinos testified that his gang did not get along with the "Clout Boyz," and he identified Miller and Lopez as two members of the "Clout Boyz." Chirinos further explained that Lopez had "snitched" on Porras and that Lopez's action required consequences. Chirinos testified that Oxford owned an AK-47 rifle and that Porras owned an AR-15 rifle.
Chirinos testified that on the night of the murder, he had hung out and smoked *274 marijuana with appellant and Porras until 9:00 p.m. Porras dropped him off at his home so he could trade marijuana for beer, and Porras subsequently picked Chirinos back up around 10:00 p.m. Porras, Oxford, and appellant were with him at that time in a tan or silver Chevrolet car. They went to a wedding party at the Fort Smith Convention Center, and at the wedding party, he overheard appellant and Porras asking where the "Clout Boyz" were. Porras later said that he knew where the trailer was, and Porras drove them there. In the car, Porras instructed them to put on masks. Chirinos stated that appellant wore a Jason Halloween hockey mask and that they all wore purple bandanas, which was the "Slangez's" color. Once at the trailer, they all got out of the car. Appellant carried the AR-15, and Porras carried the AK-47. Porras opened the gate and went up to knock on the door. Chirinos testified that he could hear talking from inside the trailer but could not understand what was said. Porras turned away from the door and yelled to shoot, and Porras and appellant started shooting at the trailer. Chirinos heard Porras and appellant cheering and yelling, "Hell, yeah," and they got back in the car and drove away. They went back to Porras's home, and Porras, Chirinos, and appellant stayed there until Porras took appellant and Chirinos home around midnight or 1:00 a.m. Chirinos denied holding any of the guns that night and stated that he thought the plan was only to rob Lopez and Miller.
Baldomero Hernandez testified at trial that he knew Porras, Guadalupe Chavez-Rodriquez, and appellant through his school. Hernandez further testified that he saw appellant, Porras, and Oxford all wearing purple bandanas at a wedding party on the night of the murder.
Detective Bill Hardin testified at trial that he interviewed Trey Miller at the police department. Miller told him that he was a member of the "Clout Boyz" and that a rival gang, the "Slangez96," did not like them. The information Miller provided led to other witnesses who aided in the investigation. Other witnesses confirmed that appellant, Porras, Chirinos, and Oxford were members of "Slangez96." Detective Hardin testified that Oxford and appellant were brought in for questioning at the same time. Although Detective Hardin was initially present during appellant's interview, he later left the room to question Oxford in another room. Oxford's interview led Detective Hardin to later recover from Oxford's residence the AK-47 used in the incident, AK-47 magazines, and a purple bandana. During the investigation, Detective Hardin also found a DPMS AR-15 rifle located in Porras's residence along with AR-15 magazines, two Halloween masks, and a cell phone. The cell phone that was taken had a previously recorded video unrelated to this shooting in which appellant can be seen holding the AK-47, Porras holding the AR-15, and Oxford holding a handgun. Appellant is wearing a black hoodie in the video.
Detective Anthony Parkinson testified at trial that he was assigned to investigate the homicide. At the scene, he briefly spoke with Trey Miller. After further investigation and speaking to other witnesses, Detective Parkinson developed appellant as a suspect. He located appellant at his mother's home and took him to the police department for a recorded interview. Detective Hardin began the interview with appellant by going over the Miranda -rights form. However, Detective Hardin left to interview another suspect, Oxford, and Detective Parkinson took over appellant's interview.
According to Detective Parkinson, appellant repeatedly requested some type of deal during the interview. However, Detective *275 Parkinson testified that he continued to tell appellant that appellant needed to tell the truth and that he (Detective Parkinson) would tell the prosecuting attorney everything appellant said. Although appellant tried to obtain some type of reassurance from Detective Parkinson that he was going to get some benefit out of the interview, Detective Parkinson stated that it was not something he was authorized to make.
Over appellant's objection, a redacted version of the video interview was played for the jury. In summary, appellant made several incriminating statements to Detective Parkinson. Appellant admitted that he went to the wedding party at the Fort Smith Convention Center the night of the murder and that he spoke with Baldomero Hernandez and Guadalupe Chavez-Rodriquez. Appellant stated that Porras, Chirinos, and Oxford were seeking information at the wedding on where they could find some "Clout Boyz." They eventually drove to the trailer, and appellant stated that everyone had a "big a* * gun" in their hands but him. Appellant stated that Chirinos had told him that the plan was to "light it up and just scare [Lopez], maybe that will send a message to the rest of them." Appellant further stated that when they arrived, he and Chirinos stayed in the car. Porras left the vehicle and went to the trailer, knocked on the door, and then returned to the car. This coincided with someone inside the trailer whistling and Porras turning around, facing the trailer, and shooting at the trailer. Appellant stated that Oxford was also shooting at the trailer. Appellant additionally stated that although he was supposed to get out to help collect the shell casings, they did not pick up the shell casings because it was muddy. Instead, appellant stated that he got out of the car to pull Porras back into the alley. After the shooting, they went back together to Porras's apartment, and appellant carried the AR-15 into the apartment. Later, Porras took appellant home.
The medical examiner testified that Lopez died from a gunshot to the head. Fragments of the bullet, including the jacket, found in the wound matched the same AR-15 recovered from Porras's apartment. Additionally, some of the shell casings found at the scene matched the AK-47 recovered from Oxford's living room. However, no fingerprints or DNA were found to link appellant to the weapons.
After the State rested, defense counsel moved for a directed verdict. As to first-degree and second-degree murder, appellant's counsel argued that there was insufficient evidence to corroborate the testimony of the accomplice that connected appellant to the offense. As to second-degree murder, counsel argued that there was insufficient evidence that appellant acted knowingly. As to the terroristic-act charges, counsel argued that there was insufficient evidence to show that appellant acted with purpose to cause physical injury to Lopez by shooting into an occupiable structure or that appellant purposely shot at the trailer with the purpose to cause serious injury or damage to property. Counsel finally argued that there was insufficient evidence to show that appellant employed a firearm. The trial court denied the motions. The defense rested without presenting any evidence, and appellant renewed all his motions for directed verdict, which the trial court denied.
Regarding jury instructions, defense counsel asked that the jury be instructed as to second-degree murder and reckless manslaughter as lesser-included offenses to first-degree murder. The State objected, and the trial court instructed the jury as to second-degree murder but refused to give a reckless-manslaughter instruction. Appellant *276 proffered the reckless-manslaughter jury instruction for the record.
During deliberations, a question was sent by the jury to the trial court that asked what their instructions were because they had eleven jurors voting guilty of second-degree murder and one juror voting not guilty. The trial court instructed the jurors to keep deliberating and not to give any specific vote counts should they have future questions.
Subsequently, Juror No. 4 advised the bailiff that because he had anticipated being home that afternoon, he did not bring any of his insulin or glucose for his diabetic medical condition. The juror further stated that he felt faint and needed to go home. The trial court discussed with the attorneys that it would substitute Juror No. 4 with one of the two alternate jurors who were still present in the courtroom but who had not participated in the jury deliberations. Defense counsel requested that they recess until the next day. However, the trial court denied that request because the jurors had been told that it would be a three-day trial, and the court did not know what plans other juror members might have had. The trial court additionally stated that there were alternate jurors available and that there was an appropriate jury instruction for cases like this one.
Initially, Juror No. 4 had indicated to the bailiff that he would try to "tough it out." However, after additional discussion among the trial court and attorneys, the trial court brought the juror out of the jury room to inquire further about his condition. The juror stated to the trial court that he had been feeling shaky and that by his symptoms, he felt that his blood sugar had dropped. After the trial court explained that deliberations could go for several hours, it asked the juror whether he wanted to go home to take care of himself, and the juror stated that he did. Defense counsel objected and requested that the juror first be allowed to try to have his medication brought to the court before being released. The trial court overruled the objection and replaced the juror with one of the two alternates. The jury was instructed to set aside and disregard all previous deliberations and begin them all over again to allow the alternate juror the opportunity to participate fully in the deliberations.
The jury subsequently found appellant guilty of one count of murder in the second degree, a Class A felony, in violation of Arkansas Code Annotated section 5-10-103(a)(1) (Repl. 2013); one count of a terroristic act, a Class Y felony, in violation of Arkansas Code Annotated section 5-13-310(a)(2) & (b)(2) ; and six counts of a terroristic act, a Class B felony, in violation of Arkansas Code Annotated section 5-13-310(a)(1). The jury additionally found that appellant had employed a firearm during the commission of each felony. Appellant was sentenced to serve 30 years' imprisonment on the count of second-degree murder, 40 years' imprisonment on the first count of a terroristic act, and 5 years' imprisonment on each of the six remaining counts of a terroristic act. Appellant was also sentenced to serve an additional 5 years' imprisonment on each count of the felony-firearm enhancements. Thus, appellant was sentenced to serve a total of 110 years' imprisonment. This appeal followed.
II. Sufficiency of the Evidence
Although appellant does not address the denial of his motions for directed verdict until his second point on appeal, we must address such a challenge first for purposes of double jeopardy. See Sweet v. State , 2011 Ark. 20, 370 S.W.3d 510. A motion for a directed verdict is a challenge *277 to the sufficiency of the evidence. Starling v. State , 2016 Ark. 20, 480 S.W.3d 158. On an appeal from a denial of a motion for a directed verdict, the sufficiency of the evidence is tested to determine whether the verdict is supported by substantial evidence, direct or circumstantial. Id. In determining whether there is substantial evidence to support the verdict, this court reviews the evidence in the light most favorable to the State and considers only that evidence that supports the verdict. Id. Substantial evidence is evidence that is of sufficient force and character to compel a conclusion one way or the other beyond suspicion or conjecture. Id.
A person commits murder in the second degree if the person knowingly causes the death of another person under circumstances manifesting extreme indifference to the value of human life. Ark. Code Ann. § 5-10-103(a)(1). A person commits the offense of a terroristic act when the person shoots at an occupiable structure with the purpose to cause injury to a person or damage to property. Ark. Code Ann. § 5-13-310(a)(2). A terroristic act is a Class Y felony if the person with the purpose of causing physical injury to another person causes serious physical injury or death to any person. Ark. Code Ann. § 5-13-310(b)(2).
A person is criminally liable for the conduct of another person when he or she is the accomplice of another person in the commission of an offense. Ark. Code Ann. § 5-2-402. An accomplice is a person who, with the purpose of promoting or facilitating the commission of an offense, solicits, advises, encourages, or coerces the other person to commit it; aids, agrees to aid, or attempts to aid the other person in planning or committing it; or having a legal duty to prevent the commission of the offense, fails to make proper effort to do so. Ark. Code Ann. § 5-2-403. When two or more persons assist each other in the commission of a crime, each is an accomplice and criminally liable, ultimately, for his or her own conduct, but the person cannot disclaim responsibility because he or she did not personally take part in every act that went to make up the crime as a whole. Meadows v. State , 2012 Ark. 57, 386 S.W.3d 470.
Furthermore, a person cannot be convicted of a felony based on the testimony of an accomplice unless that testimony is corroborated by other evidence tending to connect the defendant with the commission of the offense. Ark. Code Ann. § 16-89-111(e)(1)(A) (Supp. 2017); Foster v. State , 2017 Ark. App. 63, 510 S.W.3d 782. The corroboration must be sufficient, standing alone, to establish the commission of the offense and to connect the defendant with it; the corroboration is insufficient if it merely shows that the offense was committed and the circumstances thereof. Foster, supra. Circumstantial evidence may be used to support accomplice testimony; though it need not be so substantial in and of itself to sustain a conviction, it must, independently of the accomplice's testimony, tend in some degree to connect the defendant with the commission of the crime. Id. The test for corroborating evidence is whether, if the testimony of the accomplice were totally eliminated from the case, the other evidence independently establishes the crime and tends to connect the accused with its commission. Id. The presence of an accused in proximity of a crime, opportunity, and association with a person involved in the crime in a manner suggestive of joint participation are relevant facts in determining the connection of an accomplice with the crime. Meadows, supra.
Appellant argues on appeal that the State failed to present sufficient evidence to corroborate the accomplice testimony *278 of Jorge Chirinos. Appellant specifically argues that the State failed to present evidence to connect him with the commission of the crimes in addition to proving the occurrence of the crime. Appellant further argues that his statements to law enforcement, if considered, establish only his mere presence at the crime scene, which is insufficient. Additionally, appellant argues that the State failed to present sufficient evidence to show that appellant was an accomplice to the alleged crimes because the evidence showed only his mere presence at the crime scene and did not show the requisite criminal intent. We disagree.
Here, even excluding Chirinos's testimony, the evidence presented at trial showed more than appellant's mere presence at the crime scene as he contends. Instead, there is ample proof of appellant's joint participation with his codefendants. Baldomero Hernandez testified that he saw appellant at the wedding party on the night of the murder with Porras and Oxford and that they were all wearing purple bandannas. Further, appellant's own statements made to Detective Parkinson connect him to the commission of the crimes. Appellant admitted the following: that he went to the wedding party; Porras, Chirinos, and Oxford were seeking information on where to find "Clout Boyz"; he rode with Porras, Chirinos, and Oxford to the trailer with everyone but him holding a gun; Chirinos told appellant that the plan was to shoot at the trailer to scare and send a message to the rival gang members inside; he was assigned the task of picking up the shell casings afterwards; he got out of the car to get Porras after the shooting; and he carried the AR-15 into Porras's apartment. This evidence connects appellant to the commission of the crimes at least as an accomplice, and when a defendant incurs criminal liability as an accomplice, the law draws no distinction between the actions of the principal and those of the accomplice. Conway v. State , 2016 Ark. 7, 479 S.W.3d 1. Therefore, appellant's own statements provided sufficient corroboration of Chirinos's testimony. Additionally, after considering Chirinos's testimony that appellant shot at the trailer with the AR-15, the jury was free to believe that appellant was not only an accomplice but was the one who had, in fact, shot the victim.[1] Thus, after considering the evidence in the light most favorable to the State, this court cannot say that the trial court erred in refusing to grant appellant's motions for a directed verdict.
III. Motion to Suppress
Appellant additionally argues that the trial court erred in denying his motion to suppress and admitting the video of his statement made during his interview at the Fort Smith Police Department. A statement made while in custody is presumptively involuntary, and the burden is on the State to prove by a preponderance of the evidence that a custodial statement was given voluntarily. Bell v. State , 371 Ark. 375, 266 S.W.3d 696 (2007). When we review a trial court's ruling on the voluntariness of a statement, we make an independent determination based on the totality of the circumstances. Griffin v. State , 2015 Ark. 340, 470 S.W.3d 676 ; Grillot v. State , 353 Ark. 294, 107 S.W.3d 136 (2003). We review the trial court's findings of fact for clear error, and the ultimate question *279 of whether the statement was voluntary is subject to an independent, or de novo, determination by this court. Clark v. State , 374 Ark. 292, 287 S.W.3d 567 (2008).
Appellant contends that his statement was involuntary and thus inadmissible because the police officer made certain promises to him during the interview. Our courts have adopted a two-stage inquiry for instances in which defendants allege that false promises by police officers induced their custodial statements. Kellon v. State , 2018 Ark. 46, 538 S.W.3d 206. First, we look to the nature of the officer's statement. Id. If the officer made an unambiguous, false promise of leniency, then the statement elicited from the defendant is automatically inadmissible; if the officer made no promises of leniency, the statement is admissible. Id. If the officer's statements were of an ambiguous nature, however, we proceed to the second step of the analysis to examine the defendant's vulnerability along a number of dimensions: age, education, intelligence, length of interrogation, experience with the justice system, and the delay between the defendant's receiving Miranda warnings and the statement. Id.
Appellant argues that he was vulnerable and that Detective Parkinson gave him the false impression that his cooperation would lead to his freedom. In his brief, appellant quotes several isolated statements made by the detective in the interview. Appellant alleges that the detective told him that he, the detective, "would not "f* * * him over." Also, appellant alleges that the detective said that he was trying to help him and that he would speak to the prosecutor on appellant's behalf. Appellant further alleges that because the detective asked him about his mother and family, the detective was promising him leniency. We disagree.
First, we cannot say that any of the isolated statements appellant cites made by the detective individually or collectively were unambiguous promises of leniency. For promises to be considered unambiguous offers of leniency, we have demanded a degree of specificity that is lacking here. Kellon, supra. Rather, the statements here are more similar to those made in Kellon and in Goodwin v. State , 373 Ark. 53, 281 S.W.3d 258 (2008). In Goodwin , the police officer truthfully told Goodwin that he had told the prosecutor that Goodwin was being remorseful and seemed to be telling the truth. Id. When a police officer does not represent that he or she has the power to promise a reduced sentence but agrees to tell the prosecutor that a suspect has cooperated, it does not, without more, render a subsequent statement involuntary. Id. Telling a defendant that it would be better for the defendant to tell the truth and be remorseful is not an unambiguous promise. Id.
Here, the detective told appellant that he was trying to help him by giving him an opportunity to tell the truth. The detective did inquire about appellant's mother and whether he wanted to take care of her, but the detective did not state that appellant would be able to return home to live with her. In fact, despite appellant's repeated attempts to make a deal, Detective Parkinson repeatedly told appellant that he did not have that authority and that any decision was up to the prosecutor. Just before appellant made the incriminating statements toward the end of the interview, the detective asked him again to tell the truth and to "[j]ust get it off [his] chest." In response, appellant asked whether his slate would be clean and whether he could go home after telling the truth. Detective Parkinson clearly indicated that it was the prosecutor's decision.
I'm gonna call the prosecutor, look at me, I'm gonna call the prosecutor he's gonna come down, review the video, he's *280 gonna talk to me, I'm gonna explain to him Alberto told me the truth. He got it off his chest, his slate is clean, he has come clean, he's told us everything, 100% truthful, what do you wanna do prosecuting attorney Dan Shue. Make the decision prosecuting attorney Dan Shue. I'm going to present to him the facts, the truth, for him to make a decision on what to do. Okay? [Oxford is] telling his story, telling your story, don't let him tell your story; I want you to tell your story right now.... Don't let him paint the picture of you being a cold blooded murderer.
Therefore, the record does not reflect that the detective made an unambiguous promise of leniency meriting suppression.
Even assuming arguendo that appellant contends that the promises of leniency were of an ambiguous nature, we find no error after applying the second step of the two-stage inquiry. It does not appear from the record that appellant was vulnerable to "having his will overborne." See Kellon, supra. Going through the factors listed above, appellant was an adult, had completed his GED, had previous experience in the juvenile-justice system, and made his statements in the interview after he had received his Miranda warnings. Furthermore, immediately before appellant told his version of events, appellant acknowledged in the interview that he understood that Detective Parkinson could not promise him that he could go home.
DETECTIVE PARKINSON : That's just how it works. I'm not sure, and I don't know because I don't know anything until you tell me. I don't have the authority to sit here and say Alberto you tell me everything you know and you walk right out this door. I can't do that.
APPELLANT : You can't even assure it to me though.
DETECTIVE PARKINSON : I can't because I don't have the authority.
APPELLANT : That's what I'm saying.
....
DETECTIVE PARKINSON : Really what I wanna do is sit back and you to just tell me.
APPELLANT : I just wanna go home after this.
DETECTIVE PARKINSON : What you probably need to do is-
APPELLANT : You can't promise me that, that's my thing.
Thus, after reviewing the totality of the circumstances, we do not find that the appellant was vulnerable as contemplated by Kellon ; therefore, we cannot say that the trial court clearly erred in refusing to suppress appellant's confession.
IV. Jury Instruction-Reckless Manslaughter
Appellant further argues on appeal that the trial court erred in refusing to instruct the jury on the lesser-included offense of manslaughter. At trial, the trial court instructed the jury on first-degree murder and the lesser-included offense of second-degree murder but refused appellant's request to instruct the jury on the lesser-included offense of reckless manslaughter. Appellant proffered the instruction in our record. We have often stated that refusal to give an instruction on a lesser-included offense is reversible error if the instruction is supported by even the slightest evidence. Starling, supra. However, we will affirm a trial court's decision to exclude an instruction on a lesser-included offense if there is no rational basis for giving the instruction. Id.
Arkansas Code Annotated section 5-10-104(a)(3) states that a person commits manslaughter if the person recklessly causes the death of another person. A *281 person acts recklessly with respect to the attendant circumstances or a result of his or her conduct when the person consciously disregards a substantial and unjustifiable risk that the attendant circumstances exist or the result will occur. Ark. Code Ann. § 5-2-202(3)(A). The risk must be of a nature and degree that disregard of the risk constitutes a gross deviation from the standard of care that a reasonable person would observe in the actor's situation. Ark. Code Ann. § 5-2-202(3)(B).
In support of his request for the reckless-manslaughter instruction, appellant argued at trial that he told Detective Parkinson in his statement that no one intended to kill Lopez; rather, the plan was to just shoot up the area to scare the victims and send a message. The State argued both at trial and now on appeal that our supreme court in Bankston v. State , 361 Ark. 123, 205 S.W.3d 138 (2005), rejected a similar argument, and we agree. The defendant in Bankston shot four times at her estranged husband's SUV that was stopped at a traffic light. Id. She argued that she was entitled to a reckless-manslaughter instruction because it was rational to infer that she intended only to scare him. Id. Our supreme court rejected her argument because the act of firing four shots into a vehicle that she knew was occupied went beyond a gross deviation of the standard of care that a reasonable person would observe and was deliberate, not reckless. Id. Similarly, here, the evidence presented showed that at least forty shots were fired at the trailer when it was believed that some "Clout Boyz" were inside. Therefore, the actions were deliberate, not merely reckless. Thus, there was no rational basis for giving an instruction for reckless manslaughter, and the trial court did not err.
Appellant additionally argues for the first time on appeal that he was entitled to a reckless-manslaughter instruction because he had reason to believe that the victim was going to use a gun on them. However, appellant did not raise this particular argument below after the trial court had specifically asked the basis of his request for the proffered instruction, and it is therefore not preserved for our review. See Davis v. State , 2009 Ark. 478, 348 S.W.3d 553. Issues raised for the first time on appeal, even constitutional ones, will not be considered on appeal. Id. An appellant cannot change his or her grounds on appeal and is limited to the scope and nature of the objections presented at trial. Hampton v. State , 2014 Ark. 303, 437 S.W.3d 689.
V. Alternate Juror
Next, appellant argues that the trial court erred in substituting an alternate juror for a juror that had a health issue after deliberations had already started because (1) it was an abuse of discretion under the specific facts and circumstances of this case, and (2) the Rule of Criminal Procedure allowing for replacement of a juror after the start of deliberations violates his right to a twelve-person jury guaranteed by the Arkansas Constitution. We disagree.
We construe court rules using the same means, including canons of construction, that are used to interpret statutes. Williams v. State , 347 Ark. 728, 67 S.W.3d 548 (2002). Arkansas Rule of Criminal Procedure 32.3(b) provides that
[a]ny alternate juror, who has not replaced a regular juror prior to the time the jury retires to consider its verdict, shall be further instructed by the court in addition to the usual instruction regarding discussion of the case and not permitting any one to discuss the case with him or her, to remain at the courthouse *282 during deliberation. During deliberation, should any regular juror die, or upon good cause shown to the court be found unable or disqualified to perform his or her duties, the court may order the juror to be discharged. The court may in its discretion , as an alternative to mistrial, replace such juror with the next alternate. In such event, the court shall instruct the jury to disregard all previous deliberation, and to commence deliberation anew. The trial court in its discretion may seat additional alternates as jurors in this manner as needed.
(Emphasis added.) We will not reverse a trial court's decision to excuse a juror and replace the juror with an alternate absent an abuse of discretion. Latham v. State , 318 Ark. 19, 883 S.W.2d 461 (1994). Furthermore, we will not reverse a trial court's action unless appellant demonstrates prejudice from seating the alternate juror. Id.
Appellant first argues that the trial court abused its discretion of replacing Juror No. 4 with an alternate juror for health reasons in compliance with Arkansas Rule of Criminal Procedure 32.3 because there were less restrictive alternatives available to the court and that the juror's condition was only temporary. However, appellant cites no authority as support for his argument nor does the plain language of the rule require such an analysis. Furthermore, a review of the trial transcript reflects that the trial court considered Rule 32.3, the availability of alternates, and its concern for the juror who asked to go home for health reasons. Under these circumstances, we cannot say that the trial court abused its discretion.
Appellant lastly argues that the use of Rule 32.3(b) violated his constitutional rights because it allowed more than twelve jurors to participate in the deliberations.[2] A similar argument was made in Davies v. State , 64 Ark. App. 12, 977 S.W.2d 900 (1998). There, an alternate juror was allowed in the jury room during deliberations. Davies argued that the thirteenth juror in the room during deliberations violated his right to a trial by a twelve-person jury under the United States and Arkansas Constitutions. Id. However, we rejected his argument because he was unable to show he was prejudiced. The same is true here. Although appellant argues that the thoughts and opinions of thirteen jurors actually contributed to the verdict, the jury was specifically instructed in conformance with Rule 32.3(b) to disregard all previous deliberation and to commence deliberation anew.
Ladies and gentlemen, as you are aware, [Juror No. 4] is having some medical issues, and I have excused him. [Alternate Juror No. 1] is now going to come into your deliberations and take [Juror No. 4's] place. Since you have been deliberating on your verdicts of guilt or innocence, that has already begun, [Alternate Juror No. 1] under the law must be given the opportunity to participate fully in your deliberations. Therefore, you must set aside and disregard all your previous deliberations and begin your deliberations all over again.... You all can retire and begin your deliberations.
Jurors are presumed to be unbiased and are presumed to follow the instructions given to them by the court.
*283 Decay v. State , 2014 Ark. 387, 441 S.W.3d 899. Thus, we affirm.[3]
Affirmed.
Klappenbach and Whiteaker, JJ., agree.

There was evidence for the jury to consider that appellant was the one who had, in fact, shot the victim using an AR-15. The medical examiner testified that Lopez's death was caused by a bullet fired from an AR-15; the appellant carried the AR-15 into the Porras residence; and there was a previously recorded video depicting appellant holding the AR-15.

Although the State argues that this issue is not preserved because appellant failed to make this argument below, it is well-settled that a defendant's failure to object to the denial of the right to trial by jury does not constitute a waiver of that right. Grinning v. City of Pine Bluff , 322 Ark. 45, 907 S.W.2d 690 (1995).

Appellant made an additional argument in oral argument before this court. Upon questioning by our court, appellant's counsel contended that Rule 32.3(b) itself is unconstitutional as written. Because appellant failed to raise this argument below, this issue is not preserved for our review.