BRANDON J. HARRISON, Judge
David Wingfield appeals his convictions for rape and second-degree sexual assault, arguing that the circuit court erred in (1) denying his motion for directed verdict, (2) denying his motion to suppress, and (3) admitting a report prepared by the sexual-assault nurse examiner who examined the victim. We affirm.
In a criminal information filed in September 2017, Wingfield was charged with four counts of rape and five counts of second-degree sexual assault. Wingfield was also charged as a habitual offender. The attached affidavit for an arrest warrant explained that police had been contacted after the twelve-year-old victim, JB, told her aunt that her mother's boyfriend, Wingfield, had been having sex with her. After a jury trial, Wingfield was found guilty of all counts and sentenced to an aggregate term of eighty-five years' imprisonment. Specific facts pertinent to each point on appeal will be discussed below.
I. Sufficiency
Wingfield's sufficiency argument is his third argument on appeal, but because of double-jeopardy concerns, we consider challenges to the sufficiency of the evidence before addressing other arguments. Gillean v. State , 2015 Ark. App. 698, 478 S.W.3d 255. This court treats a motion for directed verdict as a challenge to the sufficiency of the evidence. See Tubbs v. State , 370 Ark. 47, 257 S.W.3d 47 (2007). In reviewing a challenge to the sufficiency of the evidence, this court determines whether the verdict is supported by substantial evidence, direct or circumstantial. Id. Substantial evidence is evidence forceful enough to compel a conclusion one way or the other beyond suspicion or conjecture. Id. This court views the evidence in the light most favorable to the verdict, and only evidence supporting the verdict will be considered. Id. The credibility of witnesses is an issue for the jury and *437 not the court. Morgan v. State , 2009 Ark. 257, 308 S.W.3d 147. The trier of fact is free to believe all or part of any witness's testimony and may resolve questions of conflicting testimony and inconsistent evidence. Id.
At trial, the State introduced the following pertinent evidence in support of the verdict:
Sergeant Jesus Coronado testified that he specializes in cases of sexual abuse and rape involving children. He initiated an investigation into the allegations against Wingfield and, as part of that investigation, scheduled an interview of JB at the Children's Advocacy Center in Texarkana. Jessica Kelly interviewed JB while Coronado observed on a closed-circuit television. Coronado also requested a SANE exam, which is a physical examination performed by a certified sexual-assault nurse examiner. Coronado interviewed Wingfield at the Hope Police Department and asked if he would consent to a voice-stress-analysis (VSA) test. Coronado requested that the prosecutor's office prepare a "voice stipulation," which is an agreement that the results of the VSA can be used in court.
Jessica Kelly, the lead forensic interviewer at the Texarkana Children's Advocacy Center, testified that she interviewed JB and that JB had disclosed that she had been sexually abused.
Brandi Wilson, a registered nurse, testified that in July 2017 she was working at the Children's Advocacy Center as a SANE nurse. Wilson performed a SANE exam on JB, which included collecting information on JB's medical history and assault history. Wilson read from her written report the information as given by JB regarding her assault history: "It was day and night time, he touched me with his hands on my private area. He pulled my clothes off and he pulled his down." According to Wilson, JB mumbled and was hard to understand at times; she was more comfortable pointing to body parts that had been labeled on a drawing of male and female bodies.
Andrew Watson, a former Hope Police Department detective, testified that he was the certified VSA examiner for the department in July 2017 and that he administered a VSA on Wingfield. Watson explained that he asked two questions in particular about the allegations: (1) Have you touched [JB]'s vagina, and (2) have you put your penis inside [JB]'s vagina. According to Watson, Wingfield did not respond truthfully and "showed to be deceptive on them."
JB testified that she is twelve years old and that Wingfield had been her mother's boyfriend and had lived with them. She agreed that Wingfield had touched her body in ways she did not like, that he had touched her with different parts of his body, and that it had made her uncomfortable. She indicated that he had touched her breasts and between her legs and that his private part had gone inside her private part. She also said that Wingfield had licked her breasts and her private part. JB stated that this activity had started when she was six or seven and continued until she was twelve. She identified Wingfield in the courtroom.
Wingfield moved for a directed verdict, arguing that "there's no proof of sexual intercourse or sexual deviate activity of [sic] penetration." He also asserted that the State had not met its burden for all five second-degree sexual-assault charges. The court found
There are five and six, there's at least two touching of the breast, seven, eight and nine, sexual assault that was-I mean a jury could say that based upon what was presented a trier of fact could *438 look and determine that for whatever reason sexual contact as opposed to sexual, deviate sexual activity or sexual intercourse. I mean there was contact and she said it happened in more than one house over more than one time at each of those houses. Then she said this had been happening since she was six or seven, nine, ten and eleven. That's what the evidence says. That will be up to the trier of fact determined but I believe the State has met its burden of going forward at this point.
After the defense presented its case, the directed-verdict motion was renewed and again denied.
On appeal, Wingfield makes several arguments: (1) JB's testimony was not clear or consistent; (2) there was no evidence that Wingfield was JB's guardian, temporary caretaker, or a person in a position of trust or authority over her; and (3) the jury had to speculate to distinguish nine separate offenses of rape or second-degree sexual assault. Of these arguments, the only one arguably preserved for our review is that the State failed to prove five separate instances of second-degree sexual assault. The remainder of Wingfield's arguments were not raised to the circuit court, and issues raised for the first time on appeal will not be considered. See Chavez v. State , 2018 Ark. App. 527, 564 S.W.3d 268.
A person commits the offense of second-degree sexual assault if he or she engages in sexual contact with a minor and is the minor's guardian, temporary caretaker, or a person in a position of trust or authority over the minor. See Ark. Code Ann. § 5-14-125(4)(A)(iv) (Supp. 2017). Sexual contact is defined as "any act of sexual gratification involving the touching, directly or through clothing, of the sex organs, buttocks, or anus of a person or the breast of a female." Ark. Code Ann. § 5-14-101(11). Wingfield asserts that JB did not recount separate and distinct events and that the jury had to resort to speculation and conjecture to find him guilty of five counts of second-degree sexual assault.
This court has held that a sexual-assault victim's testimony may constitute substantial evidence to support a sexual-assault conviction. Wilson v. State , 2018 Ark. App. 371, 554 S.W.3d 279. And it is not necessary for the State to prove specifically when and where each act of rape or sexual contact occurred, as time is not an essential element of the crimes. Rains v. State , 329 Ark. 607, 953 S.W.2d 48 (1997). In this case, JB testified that Wingfield touched her breasts and between her legs, with his hands and his mouth, on multiple occasions over the course of six years. The jury did not have to speculate to conclude that at least five instances of second-degree sexual assault had occurred. Thus, we hold that substantial evidence supports Wingfield's convictions.
Within Wingfield's sufficiency argument, he also argues that the circuit court erred in allowing the prosecutor to ask leading questions during JB's testimony. Our supreme court has held that if it appears necessary to lead a child witness to elicit the truth, the appellate court will affirm the circuit court's decision in allowing leading questions, absent an abuse of discretion. Clark v. State , 315 Ark. 602, 870 S.W.2d 372 (1994). Leading the witness is allowed in these circumstances because of (1) the seriousness of the crime, (2) the natural embarrassment of the witness about the incident, (3) the child's fear of being in a courtroom full of people, (4) the necessity of testimony from a victim, (5) threats toward victims from those perpetrators, and (6) to avoid the possibility that an accused might escape punishment for a serious offense merely because of the victim's *439 reluctance to testify. Id. When reviewing the decision to allow a prosecution to lead a witness, the youth, ignorance, and timidity of a witness are important factors that mitigate against a finding of an abuse of discretion. Johnson v. State , 71 Ark. App. 58, 25 S.W.3d 445 (2000).
Wingfield argues that "the record is silent regarding any evidence which suggested the alleged victim was nervous or upset at the intimate nature of the questioning," therefore the circuit court abused its discretion in allowing the prosecutor to lead the witness. We first note that while Wingfield did make three objections as to leading during JB's testimony, he has failed to abstract those objections or the circuit court's rulings. Second, in its rulings on the objections, the circuit court found that due to the child's age and the nature of the questions being asked, the State would be given leeway in its questioning. Based on a review of the record of JB's testimony, she was a reluctant witness and refused to look at Wingfield during her questioning. Thus, we disagree with Wingfield's assessment that JB was not "nervous or upset" during her questioning and hold that the circuit court did not abuse its discretion in allowing leading questions.
II. Suppression
On 30 January 2018, Wingfield moved to suppress "certain statements purportedly made by the defendant after he was taken into custody by the Hope Police Department." He alleged that these statements were not voluntarily made and were taken in violation of his constitutional and statutory rights. At a pretrial hearing on February 6, Wingfield more specifically argued that the circuit court should suppress the results of the VSA because "it was not voluntarily given or stipulated to." The court viewed a video of Andrew Watson explaining to Wingfield the consent for the VSA examination, which included his Miranda rights, and the joint agreement to admit the results of the VSA in court. Wingfield signed the consent form without asking any questions. Regarding the joint agreement to admit the results, the following exchange occurred:
WATSON : And this is our Joint Agreement to Admit the Results of the Computerized Voice Stress Analysis in court, okay? So what it is, I'm going to read all of this to you but kind of explain to you what it is. I was talking to the Prosecuting Attorney, Christi McQueen[,] and what it is she's agreeing that whatever the results are, there's a chance we'll be able to use this in court. And you'll have to agree to that and so if you think it's-you fail the test of what you're saying that I can show the Court and I say, hey, these questions I asked, he failed.
WINGFIELD : What can happen?
WATSON : If you take this test and you pass this test I'll show the Court and say hey, this is what I asked and he passed this test. He's telling the truth so but let me read this out loud to you and then you can sign it.
Watson read the agreement out loud, asked Wingfield if he agreed with it, told him he could read over it, and asked him to sign if he agreed. Wingfield signed the agreement without any further questions or comments.
Wingfield's counsel argued that Wingfield had indicated on the video
that he didn't know anything about the test. He informed him that he would take it but he didn't have no [sic] knowledge about how reliable it was, what type of test-he knew what type of test it was but he didn't know how it affects him. So if he's not fully informed, how can it be-to him; that's my point. If *440 they had told him that this test is not used in every case and basically it's considered unreliable, he may not have taken it.
The State responded that the joint agreement was sufficient according to Hayes v. State , 298 Ark. 356, 767 S.W.2d 525 (1989), which held that polygraph-test results are generally inadmissible, except upon a written stipulation of the parties. The State also argued that Wingfield had signed the stipulation without asking any further questions.
Wingfield took the stand and testified that when asked to take the VSA, "I'm pretty much like well if it pretty much lets y'all know if I did it or not well I'll take the test." When asked if he would have taken the test if he had been told that it was not reliable, he said no. But he also acknowledged that if he had passed the test, he would have wanted the judge to know that he had passed. The circuit court denied the motion to suppress and found that the VSA could be introduced into evidence.
Arkansas law prohibits the admission of polygraph test results except upon a written stipulation of the parties. Hayes, supra. Stipulation agreements about the use of polygraphs are to be scrutinized carefully by the courts and will not be honored if any questions or problems arise. Id. We review a circuit court's decision denying a defendant's motion to suppress by making an independent determination based on the totality of the circumstances. Holly v. State , 2017 Ark. 201, 520 S.W.3d 677. But a circuit court's factual findings will be reversed only if they are clearly against the preponderance of the evidence. Id. A statement made while in custody is presumptively involuntary, and the burden is on the State to prove by a preponderance of the evidence that a custodial statement was given voluntarily. Id.
Wingfield makes several arguments on this point: (1) he was given false hope of leniency; (2) the prosecuting attorney did not participate in the stipulation (even though her signature appears on the stipulation), or if she did, she violated her special duties as prosecutor that bar her from obtaining a waiver from an unrepresented defendant; (3) Detective Watson was improperly acting as an agent of the State; (4) his consent to the VSA was involuntary; and (5) VSA exams or polygraphs are inherently unreliable. Wingfield urges us to hold that the law allowing the admission of polygraph results except upon a written stipulation of the parties does not extend to situations in which the accused is not represented by counsel. Of these arguments, the only one preserved for our review is that his consent to the VSA was involuntary. The remainder of Wingfield's arguments were not raised to the circuit court, and issues raised for the first time on appeal will not be considered. See Chavez, supra.
Wingfield concedes that he was advised of his right to an attorney, waived his right to consult with counsel, and affirmatively stated that he was signing the consent to the VSA without any threat, coercion, or promise of leniency. He also concedes that he signed the stipulation in which he agreed that he was not represented by counsel and agreed to submit to the VSA without the benefit of legal advice. Nevertheless, he argues that the VSA results should not have been admitted because his participation was involuntary. His only support for this argument is that he lacked the knowledge that these tests are considered unreliable and generally not admissible.
In response, the State cites United States Supreme Court law holding that a
*441 valid waiver does not require that an individual be informed of all information "useful" in making his decision or all information that "might ... affec[t] his decision to confess." "[W]e have never read the Constitution to require that the police supply a suspect with a flow of information to help him calibrate his self-interest in deciding whether to speak or stand by his rights." Here, the additional information could affect only the wisdom of a Miranda waiver, not its essentially voluntary and knowing nature.
Colorado v. Spring , 479 U.S. 564, 576-77, 107 S.Ct. 851, 93 L.Ed.2d 954 (1987) (internal citations omitted). In other words, the State argues, Wingfield's not appreciating that the VSA might not be considered reliable concerns the wisdom of his decision to submit to the analysis but not his knowing and voluntary submission.
Wingfield raised no argument putting his cognitive or decision-making skills into question; he simply asserts that if he had known the results could be unreliable he would not have agreed to the VSA. However, he cites no law requiring police to provide such information, and although he was free to ask about the test's reliability, he did not do so. Thus, we find no error in the denial of his motion to suppress.
III. Admission of SANE Report
On 2 February 2018, the State filed notice of its intent to call Brandi Wilson, a certified SANE nurse, as an expert in sexual-assault nurse examination. The State explained that Wilson was expected to testify to statements made to her by JB during the medical-history segment of her exam and that those statements had been made for purposes of medical diagnosis or treatment. Thus, it argued, JB's statements to Wilson should be permitted under the medical-treatment exception to Ark. R. Evid. 803(4). According to the record, Wingfield did not file a response to this motion.
During Wilson's testimony at trial, she explained that she had prepared a written report as part of her exam, and she read a part of the report without objection. She also explained that during the exam, JB had been more comfortable pointing to body parts that had been labeled on a drawing of male and female bodies. When asked which parts JB had pointed to, Wilson said, "She pointed, disclosing penetration of the anus, vagina with digits and penis. And she also pointed to areas labeled mouth, breast and privates. Stating that she had been licked, kissed on her mouth, breast, buttocks and vagina." The defense objected, and the following colloquy occurred:
THE COURT : She described where she pointed to. She described within the report that she was taking down where the child pointed to.
PROSECUTOR : Yes, sir.
THE COURT : And I believe there's digital or penetration or something to that effect. However, tell me why we need to go into what the child said.
PROSECUTOR : We need to go into what the child said. This report, the SANE exam is admissible and we will submit, she can certify or verify that the copy of the report is a copy of her report and we will offer it into evidence.
THE COURT : I think you can do that.
PROSECUTOR : But the information is necessary for her to-
THE COURT : Is there an objection on hearsay to that, it's a medical report done in her job.
DEFENSE COUNSEL : I mean she's testified about what the child said, licking and kissing and all of that. I mean we was talking about just her- *442 THE COURT : It's in her report.
PROSECUTOR : But we have repeatedly in this courtroom allowed SANE examiners to testify.
THE COURT : I understand. Certainly her report is admissible. But for her to pick and pick about that report that's already admissible, isn't that the best evidence?
PROSECUTOR : Just proving-
THE COURT : I will allow you to get her qualified. That's her report and it's a copy of it and she's going to say that's her full report and you can.
DEFENSE COUNSEL : I still object to it, Your Honor.
THE COURT : Over your objection as to the admissibility of the medical report.
The hearsay exception found in Rule 803(4) provides for the admission of statements made for the purpose of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensation, as reasonably pertinent to diagnosis. Our court will not reverse a circuit court's evidentiary ruling unless there was an abuse of discretion. Williams v. State , 2012 Ark. App. 447, 2012 WL 3744714.
Wingfield argues that the circuit court erred in allowing Wilson's written report into evidence "because it was filled with the alleged victim's testimony; not necessary for medical treatment." As an example, he cites the following statement from JB as written by Wilson in her report: "It was day and night time, he touched me with his hands on my private area. He pulled my clothes off and he pulled his down." He also argues that the admission of the report was not harmless due to JB's uncertainty during her own testimony.
After expressing doubt that Wingfield's argument is preserved, the State asserts that the report was admissible under Rule 803(4) according to current appellate law:
The Arkansas Supreme Court has expressly held that the medical-treatment exception to the hearsay rule found in Rule 803(4) permits hearsay identifying the perpetrator in the special case of a child-abuse victim where the abuser is a member of the child's immediate household and the statement is made in the course of a medical examination for the purpose of diagnosis and treatment.
Elliott v. State , 2010 Ark. App. 809, at 6, 379 S.W.3d 101, 105. The State also contends that even if the report was not admissible, the error was harmless because the same or similar evidence was admitted at trial, and Wingfield had the opportunity to cross-examine JB about any statements she made to Wilson.
We hold that Wingfield's argument is not preserved. As illustrated by the above colloquy, defense counsel never articulated any argument against the report's admission, even after the circuit court suggested that counsel object on hearsay grounds, and issues raised for the first time on appeal will not be considered. See Chavez, supra.
Affirmed.
Klappenbach and Glover, JJ., agree.