Cite as 2023 Ark. App. 141

# ARKANSAS COURT OF APPEALS

DIVISION I
No. CR-22-278

| | | |
|---|---|---|
| | | Opinion Delivered March 8, 2023 |
| JIMMY STANDRIDGE | | APPEAL FROM THE MILLER |
| | APPELLANT | COUNTY CIRCUIT COURT |
| | | [NO. 46CR-20-453] |
| V. | | |
| | | HONORABLE L. WREN AUTREY, |
| STATE OF ARKANSAS | | JUDGE |
| | APPELLEE | |
| | | AFFIRMED |

**MIKE MURPHY, Judge**

Jimmy Standridge appeals the verdict of a Miller County jury convicting him of four counts of rape and six counts of sexual assault and sentencing him to 220 years in the Arkansas Department of Correction. On appeal, Standridge argues that the evidence does not support the conviction and that the circuit court abused its discretion in allowing the State to lead a witness. We affirm.

The following evidence as presented at trial support the verdict. Standridge and Amanda Fryer were divorced for a second time in 2015. Standridge had primary custody of their daughter, the victim, MC. MC was about eight in 2015 and fifteen at the time of the trial. At trial, MC testified that over the three years following the divorce, her father would initiate sex and sexual acts with her with some frequency. From roughly the age of nine to twelve, if she stayed at her father's house, she would usually sleep in bed with him. She

testified about the first time he touched her sexually. They were lying in his bed, and he touched her outside her underwear; then, he put his hand inside her underwear and progressed to moving his fingers "in and out" of her vagina.

She testified about the first time he had sex with her, shortly after her birthday. She testified how he had taken her to his bedroom, undressed her, positioned her on her stomach, had penetrative intercourse with her, and ejaculated on her back. She testified that it hurt. Another time, when she was about ten, they were going to bed, and he positioned her on her "hands and knees," got behind her, and put his penis in her vagina. She described it as "going in and out." He ejaculated on the bed. She testified similarly about another occasion when she was on her back, and he ejaculated on her stomach. MC testified that "it happened a bunch." She said that when this was happening, she usually felt scared, like she couldn't move. Physically, she said that "sometimes it hurt and sometimes it didn't." On "more [times] than [she could] count," he had touched her outside her underwear "in the front" and "just rub it and stuff." She said that "sometimes it felt good; sometimes it didn't."

She said that Standridge also put his penis in her mouth. When asked to elaborate, she explained "[h]e was usually sitting on the bed, and I would be like on the ground on my knees, like in between his legs." He would make her get on her knees. He would ejaculate in her mouth, and she would spit it out. She testified about a time that they were in the shower together and "he made me get on my knees and he put his penis in my mouth." That time she explained that he pushed her head up and down.

MC testified that Standridge told her that if she ever told "he would slit my throat or

2

take me to the woods and leave my dead body." When she was around twelve, she tried telling the school counselor. The counselor suggested calling the father to school to talk it through. MC refused to attend the meeting. MC testified that later that day, once she was home, Standridge "started beating [her] and yelling and cussing and screaming . . . he'd already, you know, been drinking." She said he was mad that she'd told the counselor. He wanted to have sex, so they did, but she "didn't do it right," which set him off more. He held a gun to her throat and told her he would shoot her throat so she couldn't talk.

MC eventually told her mother about the sexual abuse. Fryer called law enforcement, and an interview with the Children's Advocacy Center was set up. MC, who was fourteen or fifteen by then, did not tell the interviewer everything in that interview, but she did disclose the extent of the sexual abuse in a later interview with the prosecutor.

Fryer, MC's mother, testified about her relationship with Standridge, and how he was violent and controlling toward her and violent toward MC's brother, MC2. She said that Standridge would still shower with MC2 even when he was twelve or thirteen. She said that Standridge was a little too physical with MC, rubbing, patting, and constantly having her in his lap. She testified how MC became more withdrawn as she got older, and she started cutting herself. MC told Fryer that she had been touched inappropriately, prompting Fryer to call the child-abuse hotline. MC2 testified about the mental and physical abuse he experienced from his father. Looking back, he said that he realized some things were not normal like being "forced to shower with him" until he was twelve or thirteen and "forced to sleep in the same bed with him." MC2 testified that Standridge would sometimes have an

erection when they were sleeping together, and he could feel it pressing into his back or leg.

Christa Neal (an expert in child sexual abuse forensic interviewing), Kayla Berry (a detective with the Texarkana police), and Laurie Stephens (the supervisor for the Crimes Against Children Division of the Arkansas State Police) also testified for the State.

Additionally of note, throughout MC's testimony, she was difficult to hear. This was due, in part, to her crying and to her not being close enough to the microphone or speaking clearly. On numerous occasions the prosecutor repeated portions of MC's testimony before asking the next question. After several questions in this manner, Standridge's counsel objected to the leading nature of the exchanges. The court was sensitive to the objection and agreed that MC needed to speak louder, but it overruled the objection, reasoning that the prosecutor was just helping make the testimony understandable.

At the close of the State's case, Standridge moved for a directed verdict, stating that the State had failed to prove each element of the charges beyond a reasonable doubt. The court denied the motion. The motion was renewed at the close of all the evidence and again denied. The jury ultimately convicted Standridge, and Standridge now appeals. On appeal, he challenges the sufficiency of the evidence and the denial of his objection to the leading nature of portions of the State's direct examination of MC.

Standridge first challenges the sufficiency of the evidence. In reviewing challenges to the sufficiency of the evidence, we determine whether substantial evidence, direct or circumstantial, supports the verdict. *Ralston v. State*, 2019 Ark. App. 175, 573 S.W.3d 607. Substantial evidence is evidence of sufficient certainty to compel a conclusion without resort

4

to suspicion or conjecture. *Id.* On review, we view the evidence in the light most favorable to the State and only consider evidence that supports the verdict. *Hillman v. State*, 2019 Ark. App. 89, at 2, 569 S.W.3d 372, 374.

To convict Standridge of rape, the State had to prove that he "engage[d] in sexual intercourse or deviate sexual activity with" MC, "who was less than [14] years of age." Ark. Code Ann. § 5-14-103(a)(3)(A) (Supp. 2021). Sexual intercourse means the penetration, however slight, of the labia majora by a penis. Ark. Code Ann. § 5-14-101(10) (Supp. 2021). Deviate sexual activity "means any act of sexual gratification involving the penetration, however slight, of the [] mouth of a person by the penis of another person [] or of the labia majora [] of one person by any body member [] manipulated by another person." Ark. Code Ann. § 5-14-101(1)(A)–(B). A person commits second-degree sexual assault if he is eighteen years of age or older and engages in sexual contact with someone who is less than fourteen years old. "Sexual contact" is defined as "any act of sexual gratification involving the touching, directly or through clothing, of the sex organs, buttocks, or anus of a person or the breast of a female." Ark. Code Ann. § 5-14-101(9).

Standridge argues that there was no evidence presented to substantiate the rape claims by MC. He contends that there was no evidence of injury or a sexual-assault examination performed. He points out that MC changed her story from the first time she told it. However, a rape victim's testimony may constitute substantial evidence to sustain a conviction of rape, even when the victim is a child. *Brown v. State*, 374 Ark. 341, 343, 288 S.W.3d 226, 228–29 (2008). The rape victim's testimony need not be corroborated nor is scientific evidence

5

required, and the victim's testimony describing penetration is enough for a conviction. *Id.* The principle that a victim's uncorroborated testimony constitutes substantial evidence to support a guilty verdict is likewise true with respect to sexual offenses other than rape. *Id.* To the extent that Standridge attempts to attack MC's credibility, it was the jury's duty to weigh her testimony against any inconsistence evidence or conflicting testimony. *Ralston v State*, 2019 Ark. App. 175, at 14–15, 573 S.W.3d 607, 617. Accordingly, substantial evidence supports the convictions for rape and sexual assault.

Standridge next alleges the circuit court abused its discretion when it allowed the State to continue leading the witness over defense counsel objection. Several times during MC's testimony, she was difficult to hear or understand. The prosecutor would repeat what she said, then ask the next question. After doing this for a bit, defense objected. At the sidebar conference, the court acknowledged it was sensitive to the defense's position but ultimately decided to allow it to continue because MC was occasionally difficult to hear, and the prosecutor was helping ensure the witness's testimony was understandable. The court did ask the witness to speak up.

Under Rule 611(c) of the Arkansas Rules of Evidence, leading questions should not be used on the direct examination of a witness except as may be necessary to develop her testimony. The rule does not completely bar leading questions on direct but gives the circuit court discretion to permit leading questions to develop a witness's testimony; we will not reverse an evidentiary ruling absent a manifest abuse of discretion. *Chase v. State*, 334 Ark. 274, 284, 973 S.W.2d 791, 796 (1998). Here, the court did not abuse its discretion to allow

the prosecutor to occasionally repeat the statements provided by the witness. The repetition did not suggest an answer or insert a detail that should have originated from the victim. Further, MC was distressed, weeping, and occasionally reluctant to testify. Given this, allowing the prosecution some leeway with its method of questioning was not a manifest abuse of discretion. Leading a child witness to elicit the truth is allowed because of (1) the seriousness of the crime, (2) the natural embarrassment of the witness about the incident, (3) the child's fear of being in a courtroom full of people, (4) the necessity of testimony from a victim, (5) threats toward victims from those perpetrators, and (6) the need to avoid the possibility that an accused might escape punishment for a serious offense merely because of the victim's reluctance to testify. *Wingfield v. State*, 2019 Ark. App. 111, at 5–6, 572 S.W.3d 434, 438–39.

Affirmed.

VIRDEN and HIXSON, JJ., agree.

*David L. Dunagin*, for appellant.

*Leslie Rutledge*, Att'y Gen., by: *Clayton P. Orr*, Ass't Att'y Gen., for appellee.